C. R. KLEWIN NORTHEAST, LLC *v.* JAMES T. FLEMING, COMMISSIONER OF PUBLIC WORKS, ET AL.
(SC 17779)

Rogers, C. J., and Katz, Palmer, Vertefeuille and Schaller, Js.

Argued September 4—officially released October 23, 2007

*Susan Quinn Cobb*, assistant attorney general, with whom were *Robert W. Clark* and *Eileen M. Meskill*, assistant attorneys general, and, on the brief, *Richard Blumenthal*, attorney general, for the appellants (defendants).

*Eliot B. Gersten*, for the appellee (plaintiff).

*Opinion*

KATZ, J. The defendants, James T. Fleming, the commissioner of public works, M. Jodi Rell, the governor, and Nancy Wyman, the state comptroller, appeal from the judgment of the trial court rendering summary judgment in favor of the plaintiff, C. R. Klewin Northeast, LLC, and issuing a writ of mandamus ordering Wyman to pay $1.2 million to the plaintiff in compliance with a prior agreement to settle a claim for extra costs that the plaintiff had incurred for construction work performed at Manchester Community College, pursuant to a contract between the parties. The dispositive issue in this appeal is whether the trial court improperly denied the defendants' motion to dismiss for lack of

subject matter jurisdiction under the doctrine of sovereign immunity. The defendants contend that the state has not consented to be sued under General Statutes § 3-7 (c),[1] the statute pursuant to which the trial court issued the writ, and that the exception to sovereign immunity in actions for declaratory or injunctive relief when officials have acted in excess of their statutory authority does not apply. We agree with the defendants that they are entitled to sovereign immunity, and therefore, we reverse the trial court's judgment.

Because our review of the trial court's denial of the motion to dismiss is dispositive of this case, we take the facts as expressly set forth, and necessarily implied, in the plaintiff's complaint, construing them in the light most favorable to the pleader. *First Union National Bank* v. *Hi Ho Mall Shopping Ventures, Inc.*, 273 Conn. 287, 291, 869 A.2d 1193 (2005). The plaintiff's complaint alleges the following facts. In October, 1998, the depart-

---

[1] General Statutes § 3-7 provides: "(a) Except as otherwise provided in this subsection, any uncollectible claim for an amount of one thousand dollars or less may be cancelled upon the books of any state department or agency upon the authorization of the head of such department or agency. Any uncollectible costs in an amount less than five thousand dollars incurred by the Commissioner of Environmental Protection pursuant to section 22a-451, for investigating, containing, removing, monitoring or mitigating pollution and contamination, emergency or hazardous waste may be cancelled by the commissioner, in accordance with procedures approved by the State Comptroller.

"(b) The Secretary of the Office of Policy and Management may authorize the cancellation upon the books of any state department or agency of any uncollectible claim for an amount greater than one thousand dollars due to such department or agency.

"(c) Upon the recommendation of the Attorney General, the Governor may authorize the compromise of any disputed claim by or against the state or any department or agency thereof, and shall certify to the proper officer or department or agency of the state the amount to be received or paid under such compromise. Such certificate shall constitute sufficient authority to such officer or department or agency to pay or receive the amount therein specified in full settlement of such claim. The record of any compromise effected pursuant to the provisions of this section shall be open to public inspection in accordance with section 1-210."

ment of public works (department) entered into a contract with the plaintiff to construct the New Resource Learning Center and the Lowe Building at Manchester Community College. During the course of performance of the contract, disputes arose over extra costs. Through negotiations, the parties were able to reach a settlement whereby the state would pay $1.2 million to the plaintiff to settle those disputes. The department wrote to the attorney general's office and recommended acceptance of the settlement and asked the attorney general to " 'expedite acceptance of the negotiated settlement.' " Pursuant to § 3-7 (c), the attorney general recommended to Governor Rell (governor) that the settlement be accepted and that disbursement of the funds be authorized. On March 8, 2005, the governor signed a certificate authorizing the department to settle the claim in the amount of $1.2 million. The plaintiff never received payment.

The record also reveals the following procedural history. The plaintiff commenced this action seeking a writ of mandamus to compel the defendants to comply with the settlement. The plaintiff alleged that mandamus was the proper remedy because Fleming and Wyman had a "purely ministerial and non-discretionary legal" duty to implement the settlement and pay the plaintiff upon the governor's authorization.

The defendants thereafter filed a motion to dismiss the plaintiff's claim for lack of subject matter jurisdiction based on the doctrine of sovereign immunity. The trial court denied the motion. In so ruling, the trial court determined that, although the state had not consented to suit under § 3-7 (c), the exception to the state's immunity from suit in actions for declaratory or injunctive relief when officials have acted in excess of their statutory authority applied. More specifically, the trial court concluded that the governor's authorization, pursuant to § 3-7 (c), and her constitutional position as the

"supreme executive power of the state" had created a duty in Fleming and Wyman to effect the settlement. The court further concluded that writs of mandamus are "in the nature of mandatory injunctions," and, accordingly, the rationale for allowing suits against state officials for injunctive relief would apply. Thus, the trial court determined that the plaintiff's complaint, which alleged inaction of state officials in contravention of an official duty and sought injunctive relief in the form of mandamus, could not be dismissed on the basis of sovereign immunity.

Following this decision, the defendants filed a motion to strike the complaint, contending that the plaintiff's application for a writ of mandamus was improper because other adequate remedies at law exist,[2] namely, an application to the claims commissioner under General Statutes § 4-160 (a)[3] for authorization to sue the state, or a contract action under General Statutes § 4-61.[4] Following oral argument, the trial court denied this motion from the bench.

[2] It is undisputed that, prior to its action for a writ of mandamus, the plaintiff had sought permission to bring an action against the state from the claims commissioner pursuant to General Statutes § 4-160 (a) and also had served a separate complaint on the defendants for breach of contract and quantum meruit. The plaintiff ultimately did not pursue either of these alternative avenues.

[3] General Statutes § 4-160 (a) provides: "When the Claims Commissioner deems it just and equitable, the Claims Commissioner may authorize suit against the state on any claim which, in the opinion of the Claims Commissioner, presents an issue of law or fact under which the state, were it a private person, could be liable."

[4] General Statutes § 4-61 provides in relevant part: "(a) Any person, firm or corporation which has entered into a contract with the state . . . for the design, construction, construction management, repair or alteration of any . . . building or other public works . . . may, in the event of any disputed claims under such contract or claims arising out of the awarding of a contract by the Commissioner of Public Works, bring an action against the state to the superior court for the judicial district of Hartford for the purpose of having such claims determined . . . .

"(b) As an alternative to the procedure provided in subsection (a) of this section, any such person, firm or corporation having a claim under said

Thereafter, the defendants filed their answers, and asserted several special defenses, inter alia, that: (1) the court lacked subject matter jurisdiction on sovereign immunity grounds; (2) the plaintiff had not stated a claim upon which mandamus relief could be granted because it did not have a clear right to payment, none of the acts the plaintiff sought to have the defendants perform were purely ministerial, and the plaintiff had other adequate legal remedies; and (3) subsequent to the governor's authorization, the defendants had become aware of information that raised concerns about whether settlement was in the state's best interests. With regard to this last defense, the defendants sought to present information related to the plaintiff's relationship with former governor John G. Rowland and that relationship's bearing on the plaintiff's contract with the state in order to establish an equitable defense of unclean hands.

The parties then filed motions for summary judgment. In a memorandum of decision dated September 20, 2006, the trial court rendered summary judgment in favor of the plaintiff, determining that the plaintiff was entitled to mandamus relief. The trial court found that the parties' negotiations had resulted in a final settlement agreement conditioned only on the governor's authorization.[5] It concluded that the governor's formal approval of the settlement had created a legal right to payment in the plaintiff and that Fleming and Wyman had a mandatory duty to perform in accordance with the governor's authorization. The trial court further concluded that the plaintiff had no other adequate administrative or legal remedy to enforce this agreement and

subsection (a) may submit a demand for arbitration of such claim or claims for determination . . . ."

[5] In finding that the parties had reached a final settlement agreement, the trial court rejected the defendants' claim that obtaining the approval of the state bond commission, and thus securing funding, was a condition precedent to the settlement agreement.

that the equities weighed in favor of granting the writ. Accordingly, the trial court ordered the defendants to pay the plaintiff the $1.2 million to settle the dispute.

The defendants then appealed from the judgment of the trial court to the Appellate Court. We transferred the appeal to this court, pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1. The defendants assert on appeal that: (1) the plaintiff's action is barred by the doctrine of sovereign immunity because (a) the action is tantamount to an action for money damages, and (b) the defendants did not act in excess of any statutory duty under § 3-7 (c) so as to except them from the protections of sovereign immunity; and (2) the trial court improperly granted the plaintiff's application for a writ of mandamus despite the facts that (a) alternate remedies were available to the plaintiff, (b) the governor's authorization did not create a ministerial duty to pay the amount of the settlement, and (c) a balancing of the equities weighed against granting the writ. The plaintiff responds that the defendants' violation of the provisions of § 3-7 (c) and the plaintiff's legal right to payment under a final settlement agreement entitle it to mandamus relief. The plaintiff further contends that the alternate legal remedies are inadequate because they would cause the plaintiff expense and delay.

Assuming without deciding that this suit properly is fashioned as a suit for injunctive relief in the form of an application for a writ of mandamus, we agree with the defendants that the trial court improperly determined that they had acted in excess of their statutory authority. Therefore, the defendants are entitled to sovereign immunity, and, accordingly, we do not reach the other issues raised by the parties.

Sovereign immunity relates to a court's subject matter jurisdiction over a case, and therefore presents a question of law over which we exercise de novo review.

*184 Windsor Avenue, LLC* v. *State*, 274 Conn. 302, 308, 875 A.2d 498 (2005). In so doing, we "must decide whether [the trial court's] conclusions are legally and logically correct and find support in the facts that appear in the record." (Internal quotation marks omitted.) Id.

The principle that the state cannot be sued without its consent, or sovereign immunity, is well established under our case law. See *Miller* v. *Egan*, 265 Conn. 301, 313, 828 A.2d 549 (2003). It has deep roots in this state and our legal system in general, finding its origin in "ancient common law." *Horton* v. *Meskill*, 172 Conn. 615, 623, 376 A.2d 359 (1977); *Bergner* v. *State*, 144 Conn. 282, 284–85, 130 A.2d 293 (1957). Not only have we recognized the state's immunity as an entity, but "[w]e have also recognized that because the state can act only through its officers and agents, a suit against a state officer concerning a matter in which the officer represents the state is, in effect, against the state." (Internal quotation marks omitted.) *Miller* v. *Egan*, supra, 313, quoting *Fetterman* v. *University of Connecticut*, 192 Conn. 539, 550–51, 473 A.2d 1176 (1984). Exceptions to this doctrine are few and narrowly construed under our jurisprudence. See *Miller* v. *Egan*, supra, 314–16; *Krozser* v. *New Haven*, 212 Conn. 415, 421, 562 A.2d 1080 (1989), cert. denied, 493 U.S. 1036, 110 S. Ct. 757, 107 L. Ed. 2d 774 (1990); *Doe* v. *Heintz*, 204 Conn. 17, 31–32, 526 A.2d 1318 (1987).

We previously have held that a litigant that seeks to overcome the presumption of sovereign immunity must show that "(1) the legislature, either expressly or by force of a necessary implication, statutorily waived the state's sovereign immunity . . . or (2) in an action for declaratory or injunctive relief, the state officer or officers against whom such relief is sought acted in excess of statutory authority, or pursuant to an unconstitutional statute." (Citation omitted.) *Miller* v. *Egan*, supra,

265 Conn. 314. In making this determination, "this court has recognized the well established principle that statutes in derogation of sovereign immunity should be strictly construed. . . . Where there is any doubt about their meaning or intent they are given the effect which makes the least rather than the most change in sovereign immunity." (Internal quotation marks omitted.) *Chatterjee* v. *Commissioner of Revenue Services*, 277 Conn. 681, 691, 894 A.2d 919 (2006).

In *Miller* v. *Egan*, supra, 265 Conn. 314–15, 322, we explained the rationale of the exception to sovereign immunity when an official has acted in excess of his statutory authority. As the court stated therein, when an official acts in excess of his statutory authority and does not carry out government policy, an individual's "right to be free from the consequences of such action outweighs the interest served by the sovereign immunity doctrine." (Internal quotation marks omitted.) Id., 322; see also *Horton* v. *Meskill*, supra, 172 Conn. 624 ("the government cannot justifiably claim interference with its functions when the acts complained of are unconstitutional or unauthorized by statute" [internal quotation marks omitted]). We held, however, that this exception applies only to actions for injunctive or declaratory relief.[6] *Miller* v. *Egan*, supra, 327. The reason for this qualification was to protect the state from significant interference with its functions and to limit the rule to declaratory or injunctive suits, in which the trial court carefully can tailor the relief. Id., 317.

The plaintiff does not claim that § 3-7 (c) satisfies the stringent test we have imposed for an express or implied statutory waiver of sovereign immunity. See *St.*

---

[6] In so doing, we overruled our previous decisions in *Shay* v. *Rossi*, 253 Conn. 134, 749 A.2d 1147 (2000), and *Antinerella* v. *Rioux*, 229 Conn. 479, 642 A.2d 699 (1994), to the extent that those cases held that actions for monetary damages are not barred by sovereign immunity under the excess of statutory authority exception. *Miller* v. *Egan*, supra, 265 Conn. 325.

*George* v. *Gordon*, 264 Conn. 538, 549–50, 825 A.2d 90 (2003); *Martinez* v. *Dept. of Public Safety*, 263 Conn. 74, 82, 818 A.2d 758 (2003). Rather, the plaintiff essentially contends that this case falls into the judicially created exception to sovereign immunity for officials who have acted in excess of their statutory authority.[7] More specifically, the plaintiff contends, and the trial court agreed, that the state is not entitled to sovereign immunity because § 3-7 (c) required Fleming and Wyman to take the actions necessary to effect payment in the amount agreed upon in settlement of the claim once the governor had authorized that payment, and in failing to do so, they had acted in contravention of their authority under the statute. Thus, the threshold—and ultimately dispositive—issue, which we must determine through a process of statutory construction, is whether § 3-7 (c) creates a mandatory duty. See *Miller* v. *Egan*, supra, 265 Conn. 327 ("when a process of statutory interpretation establishes that the state officials acted beyond their authority, sovereign immunity does not bar an action seeking declaratory or injunctive relief"); see also *Cox* v. *Aiken*, 278 Conn. 204, 212–13 n.12, 897 A.2d 71 (2006).

Because issues of statutory construction are questions of law, we review the trial court's conclusions as to these issues de novo, under well settled principles.

[7] The parties' briefs to this court address the issue of sovereign immunity primarily in the context of the questions of whether mandamus relief generally, and mandamus relief to enforce a settlement agreement specifically, constitute the type of equitable relief that falls within the exception to sovereign immunity. The parties have directed their arguments regarding whether § 3-7 (c) gave rise to an obligation to comply with the settlement and thereby pay the amount agreed upon to the plaintiff in the context of the question of whether mandamus relief properly may be ordered. Because we conclude that the dispositive question is whether § 3-7 (c) imposed a mandatory duty to pay the plaintiff the $1.2 million under the settlement agreement, such that the failure to do so could constitute an act in excess of statutory authority, we consider the parties' arguments only as they bear on this issue.

*Southern New England Telephone Co.* v. *Cashman*, 283
Conn. 644, 650, 931 A.2d 142 (2007). "When construing
a statute, [o]ur fundamental objective is to ascertain
and give effect to the apparent intent of the legislature.
. . . In other words, we seek to determine, in a rea-
soned manner, the meaning of the statutory language
as applied to the facts of [the] case, including the ques-
tion of whether the language actually does apply. . . .
In seeking to determine that meaning, General Statutes
§ 1-2z directs us first to consider the text of the statute
itself and its relationship to other statutes. If, after
examining such text and considering such relationship,
the meaning of such text is plain and unambiguous and
does not yield absurd or unworkable results, extratex-
tual evidence of the meaning of the statute shall not
be considered. . . . When a statute is not plain and
unambiguous, we also look for interpretive guidance
to the legislative history and circumstances surrounding
its enactment, to the legislative policy it was designed to
implement, and to its relationship to existing legislation
and common law principles governing the same general
subject matter . . . ." (Internal quotation marks omit-
ted.) Id., 650–51.

Section 3-7 (c) provides in relevant part: "Upon the
recommendation of the Attorney General, the Governor
may authorize the compromise of any disputed claim
by or against the state or any department or agency
thereof, and shall certify to the proper officer or depart-
ment or agency of the state the amount to be received
or paid under such compromise. Such certificate shall
constitute sufficient authority to such officer or depart-
ment or agency to pay or receive the amount therein
specified in full settlement of such claim. . . ."

In the present case, the trial court determined that,
under § 3-7 (c), Fleming and Wyman had a ministerial
duty to effect the payment to the plaintiff once the
governor had authorized the amount of the settlement,

and, by failing to pay it, Fleming and Wyman had exercised discretion not afforded to them under the statute.[8] We disagree that § 3-7 (c) indicates that the governor's authorization was intended to create a mandatory duty to pay a claimant.

As a preliminary matter, we conclude that the text of § 3-7 (c) is not plain and unambiguous because it does not expressly speak to a duty to pay or lack thereof. See *Teresa T.* v. *Ragaglia*, 272 Conn. 734, 744, 865 A.2d 428 (2007) ("[w]e conclude that the language of the statute [permitting removal of a child in imminent risk of physical harm] is not plain and unambiguous because it does not *expressly* require the commissioner [of children and families] to remove a child from unsafe surroundings upon a finding of probable cause" [emphasis added]).

The relevant statutory language that we must examine is "[s]uch certificate [of authorization by the gover-

[8] As we previously have noted, the parties devote significant attention to the issue of whether the present action is really a contract action for money damages or properly fashioned as a suit for injunctive relief in the form of a writ of mandamus. See *St. George* v. *Gordon*, supra, 264 Conn. 550 n.12 (noting that excess of statutory authority exception to sovereign immunity did not apply when plaintiff's request for declaratory judgment was "really tantamount" to action for monetary damages). The plaintiff contends that the trial court properly could not address, in a motion to dismiss, whether the plaintiff's claim was an action for breach of contract in disguise without also reaching the merits of the mandamus action, namely, whether § 3-7 (c) creates a mandatory statutory duty. We recognize that one of the requirements for a writ of mandamus is a "mandatory" duty imposed by law; *Jalowiec Realty Associates, L.P.* v. *Planning & Zoning Commission*, 278 Conn. 408, 412, 898 A.2d 157 (2006); and therefore, there is some overlap in our determination as to whether § 3-7 (c) creates a mandatory duty both to the applicability of the sovereign immunity exception in *Miller* v. *Egan*, supra, 265 Conn. 314, for actions against a state officer for conduct in excess of statutory authority, and one prong of the test for mandamus actions. Again, because this determination is dispositive of the threshold sovereign immunity issue, we need not determine whether this suit properly can be deemed a suit for injunctive relief or address the other requirements for a writ of mandamus.

nor] *shall constitute sufficient authority* to such officer or department or agency to pay or receive the amount therein specified in full settlement of such claim." (Emphasis added.) General Statutes § 3-7 (c). At the outset, we note the legislature's use of the phrase "shall constitute sufficient authority . . . to pay" in § 3-7 (c), as opposed to language such as "shall cause such official to pay" or "upon authorization, such official shall pay." Here, the word "shall," which often, but not always, is construed as indicating a mandatory duty under a statute; *Teresa T.* v. *Ragaglia*, supra, 272 Conn. 744; is not juxtaposed with the substantive action verb on which the plaintiff's alleged right arises, i.e., "to pay," as it usually is in other circumstances when this court has determined that a statute imposes a mandatory obligation. See, e.g., *Pedro* v. *Miller*, 281 Conn. 112, 117, 914 A.2d 524 (2007) (concluding that phrase " '*shall be served* within one hundred twenty days of the return date specified in the plaintiff's original complaint' " mandated such service [emphasis in original]); *Clapp* v. *Ulbrich*, 140 Conn. 637, 641, 103 A.2d 195 (1954) (concluding that statute prescribing that "public official 'shall issue such licenses to such suitable persons as may apply therefore' " made it "mandatory upon the official to issue the license to the applicant if the latter is a suitable person"); *State ex rel. Adams* v. *Crawford*, 99 Conn. 378, 382, 121 A. 800 (1923) (concluding that statute providing that " 'upon the surrender of his license,' the [county] commissioners 'shall reimburse such licensee' " mandated such reimbursement). In § 3-7 (c), "shall" is linked with "constitute," which is not a term that gives rise to a duty to act. Rather, "constitute," meaning "to set up, post, establish, appoint, ordain"; Oxford English Dictionary (2d Ed. 1998); refers to a state of being; in this case, the state of being authorized or empowered to pay.

Central to the meaning of § 3-7 (c) is its use of the word "authority" and its variants. "[A]lthough the word

'authorize' has been construed in certain contexts as having a mandatory effect . . . the common understanding of the term as expressed in the law and in dictionaries is '[t]o endow with authority or effective legal power' . . . which does not imply a mandatory duty." (Citations omitted.) *Teresa T.* v. *Ragaglia,* supra, 272 Conn. 744. To authorize means "[t]o give formal approval to; to sanction, approve, countenance." Oxford English Dictionary (2d Ed. 1998). Thus, this provision, by its terms, appears to do no more than authorize the governor in turn to authorize or empower a lower official to settle a disputed claim and to set the outer limits on the amount that may be paid pursuant to that compromise. There is, however, no express language or textual implication that the official, upon being vested with such power, *must* pay the amount in settlement of the claim.

On the face of § 3-7 (c), the legislature's primary purpose seems to be merely to create a procedural mechanism to facilitate the settlement of claims and the efficient use of the state's resources in resolving disputes. See *Pytko* v. *State,* 28 Conn. Sup. 173, 177, 255 A.2d 640 (1969) (stating, in context of dispute over whether governmental entity had power to enter into agreement to arbitrate dispute, that § 3-7 did not prevent court from implying such power, because § 3-7 "goes no further than to specify the *procedure* for compromising claims by or against the state" [emphasis added]). Section 3-7 (c) thus creates a chain of command to obtain proper authority to resolve a dispute, similar to the authority that any agent or legal representative would seek from their principal in the settlement context. When a "legislative provision is designed to secure order, system and dispatch in the proceedings, it is generally held to be [discretionary]"; (internal quotation marks omitted) *Lostritto* v. *Community Action Agency of New Haven, Inc.,* 269 Conn. 10, 19, 848 A.2d 418

(2004); rather than to create mandatory obligations or substantive rights. Consistent with this rule, the procedural nature of § 3-7 (c) does not render it susceptible to an interpretation that it was meant to establish a mandatory duty to pay.

This reading of § 3-7 (c) is bolstered by viewing the text of § 3-7 as a whole. See General Statutes § 1-2z. The other subsections create procedures for state departments and agencies to cancel from their books uncollectible claims that the state has against others. See General Statutes § 3-7 (a) (procedure for claims under $1000); General Statutes § 3-7 (b) (procedure for claims in excess of $1000). These subsections, taken together with subsection (c), illustrate that the purpose of § 3-7 as a whole was to create simpler internal processes for resolving uncollectible or disputed claims.

The legislative history of § 3-7 (c) further supports this interpretation. As the trial court correctly noted, the legislative history for this provision is sparse. That section originally was enacted in 1917 as part of "An Act concerning Abatement of Taxes and Compromise of Disputed Claims." Public Acts 1917, c. 151. The text of the original provision was largely the same as it is today, except that the power to authorize an officer or a department to settle a disputed claim was vested solely in the "board of control," a body consisting of the governor, the attorney general and other officials. In the finance committee hearing on the bill underlying the 1917 Public Act, the state tax commissioner explained his understanding of the purpose of what is now subsection (c) as follows: "[V]ery often the state has a claim which may be found to be incorrect, and in like manner corporations have claims against the state, the justice of which is apparent but no means of adjusting except through a suit. This is especially true regarding injuries on state highways. Where someone is injured and there is no way in which that can be

paid except by bringing [a] claim before the General Assembly or by bringing a case in the Superior Court. If the Board of Control is given this power to compromise claims it will certainly not be abused and will result in saving[s]."[9] Conn. Joint Standing Committee Hearings, Finance, 1917 Sess., pp. 97–98, testimony of William Corbin. This comment further indicates that the provision was intended to provide a procedure that would allow the state to settle its disputed claims more conveniently and to avoid cumbersome litigation or other formal means of dispute resolution.[10]

The plaintiff contends, however, that, if this court were to construe the governor's authorization in § 3-7 (c) merely to vest discretion in a department official to settle a disputed claim, that construction cannot be reconciled with the governor's certification of the amount "to be . . . paid" and would give the governor no real power to settle a claim, thereby rendering the

[9] The trial court concluded that the language "[i]f the board of control [board] is given [the] power to compromise claims" meant that the board's authorization of a compromise was in effect a "final resolution of a disputed claim . . . ." For the reasons stated herein, we conclude that the more plausible reading of this language is that the board's, now the governor's, authorization of a compromise simply vests power in the lower official to compromise up to a specific amount.

[10] The defendants also point to an opinion by Attorney General Richard Blumenthal, dated October 15, 1999, in support of their argument that § 3-7 (c) is discretionary and not mandatory. That opinion dealt with an inquiry by the department of economic and community development concerning whether it could accept "discounted repayments of financial assistance from financially distressed funding recipients" without first complying with the provisions of § 3-7 (c). Opinions, Conn. Atty. Gen. No. 99-011 (October 15, 1999) p. 1. The opinion, which opined more on subsection (b) than (c), found that the "the [g]overnor's certification of compromise would provide [the department of economic and community development] authority to amend the assistance agreement to reflect the reduced amount due." Id., p. 3. It therefore required compliance with § 3-7 (c) before entering into a compromise. Id. To the limited extent that this is relevant, this document is consistent with our conclusion that the governor's authorization provides departmental officials with the power to enter into a compromise of a disputed claim, but does not compel them to do so.

statute meaningless. We disagree. The words "to be . . . paid" may not be read in isolation, but, rather, must be read in the context of the entire statutory provision. See *Barry* v. *Quality Steel Products, Inc.*, 280 Conn. 1, 9, 905 A.2d 55 (2006) ("[w]e construe a statute as a whole and read its subsections concurrently in order to reach a reasonable overall interpretation" [internal quotation marks omitted]). When read in context, the governor's certification of the amount "to be . . . paid" confers the power to settle on an official, and then sets the limits of that authorization. Thus, our interpretation does not render the statute meaningless, because, in accordance with all of the other indicators we have examined previously herein, § 3-7 (c) provides a simplified procedure by which the state can settle claims without resorting to other judicial or administrative procedures.

We therefore conclude that the legislature did not intend for the governor's authorization under § 3-7 (c) to create a mandatory duty in a department official to pay a settlement of a disputed claim. Accordingly, Fleming and Wyman did not act in excess of their statutory authority when they failed to effect the payment to the plaintiff pursuant to the governor's authorization, and the plaintiff's claim does not fall within the exception to sovereign immunity.

The judgment is reversed and the case is remanded with direction to render judgment dismissing the action for lack of subject matter jurisdiction.

In this opinion the other justices concurred.