JOHN P. CURRY *v.* ALLAN S. GOODMAN, INC.
(SC 18025)

Norcott, Katz, Palmer, Vertefeuille and Schaller, Js.

---

Argued January 10—officially released April 15, 2008

*Richard E. Hayber*, for the appellant (plaintiff).

*Glenn A. Duhl*, with whom was *George J. Kelly, Jr.*, for the appellee (defendant).

*Nancy Alisberg* and *Charles Krich* filed a brief for the office of protection and advocacy for persons with disabilities et al. as amici curiae.

*Opinion*

KATZ, J. The plaintiff, John P. Curry, appeals from the trial court's summary judgment rendered in favor of his former employer, the defendant, Allan S. Goodman, Inc., on the plaintiff's claims that the defendant discriminated against him because of his disability in violation of General Statutes § 46a-60 (a) (1)[1] of the Connecticut Fair Employment Practices Act (act). The plaintiff contends, inter alia, that the trial court improperly concluded that he had not met his burden of proving that he was a qualified person with a disability capable of performing the essential functions of his job with or without reasonable accommodation from the defendant. We conclude that the trial court improperly rendered summary judgment because there is a disputed issue of material fact as to whether the plaintiff was able to perform the job with reasonable accommoda-

---

[1] General Statutes § 46a-60 (a) provides in relevant part: "It shall be a discriminatory practice in violation of this section:

"(1) For an employer . . . except in the case of a bona fide occupational qualification or need, to refuse to hire or employ or to bar or to discharge from employment any individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment because of the individual's race, color, religious creed, age, sex, marital status, national origin, ancestry, present or past history of mental disability, mental retardation, learning disability or physical disability, including, but not limited to, blindness . . . ."

tion, and, accordingly, we reverse the trial court's judgment.

The record reveals the following relevant facts, which are, unless otherwise indicated, undisputed. The plaintiff began working as a driver for the defendant, a distributor of wines and liquors, in September, 1986. In that position, the plaintiff had to lift cases of liquor weighing between forty and seventy pounds on and off his truck. On or about August 26, 1998, the plaintiff injured his back during work when lifting a case of liquor. Thereafter, in 1998 and 1999, the plaintiff underwent two surgeries for his injury. Following the second surgery, the plaintiff returned to work in September, 2000, but was restricted by his physician, Charles B. Kime, to working four hours a day, lifting a maximum of fifteen pounds at a time, and avoiding prolonged periods (more than thirty minutes) of sitting or standing. Shortly thereafter, Kime increased the weight restriction to twenty-five pounds.

When the plaintiff returned to work, the defendant negotiated with the plaintiff's union and placed him in a night shift position, working the "split line" in the warehouse. Although employees normally bid on these positions every six months on the basis of their seniority, because he was injured, the plaintiff temporarily was given the split line warehouse job pursuant to the agreement between the plaintiff's union and the defendant.

The split line duty is one of the primary warehouse responsibilities. During their ten hour shift, these workers stand along a conveyor belt and work as a team to fill empty cartons with bottles of liquor from flow racks abutting the belt. The bottles weigh only a few pounds and are stacked vertically in the flow racks at four different height levels; therefore, a split line worker must be able to pull the bottles from all four levels.

Although the racks are restocked by employees on the prior shift, at times, a certain type of product may run out during the night shift. On such occasions, a night shift employee on the split line will have to retrieve a full case of that item, which may weigh more than twenty-five pounds, to restock the flow rack for that item.[2] If an employee's particular split line task is completed before the end of the shift, he or she may be asked to help with other miscellaneous responsibilities, such as loading trucks or driving forklifts, or to work on the "solid line."[3]

When the defendant first placed the plaintiff on the split line, he was required to do only light duty tasks and was not required to replace empty cases with full cases. At that time, the company's policies with regard to work related injuries stated: "Light duty status is intended to be a temporary, transitional situation. . . . Employees who have been on light duty status for sixty days must have their status reevaluated to determine when and if they will be able to return to full duty status." In this light duty status, the plaintiff initially worked only a five hour shift, but gradually increased his hours to ten hours as his condition improved.

On or about October 12, 2000, the plaintiff had an altercation with the night shift supervisor, Brian O'Connor, after one of the racks ran out of a particular brand of liquor. The events that ensued are in dispute. The plaintiff attested that the incident took place in the following manner. He marked an order form to indicate which item was "out of stock" and then asked a coworker, Art Schreiber, to retrieve a case from the

---

[2] The parties dispute how often this happens and whether retrieving the case is an essential function of a worker assigned to the split line.

[3] Solid line work consists of picking full cases of product from the flow racks or pallets on the floor to fill orders. In addition to the primary warehouse positions of split line and solid line, other night shift employees operate forklifts, load trucks or provide other utility assistance.

warehouse for him. Before Schreiber could retrieve the case, O'Connor saw the form and asked the plaintiff: "What the fuck is this?" O'Connor then shut down the conveyor belt and demanded that the plaintiff instruct Schreiber or another worker immediately to retrieve the case for him. O'Connor then commented: "I've got handicapped people all over the place in here!"

In contrast, O'Connor attested that the events had transpired differently. He stated that, when he asked the plaintiff about the order form, the plaintiff told him that the liquor was out of stock. O'Connor then instructed the plaintiff to ask Schreiber to retrieve the item and returned to his desk. Later, O'Connor saw the plaintiff going to retrieve the item himself, at which point O'Connor stopped him and told him: "You're not going to get the case. I'm not going to have you hurt yourself more than you already are." The plaintiff then yelled, "[T]hese fucking guys aren't getting it; it's not my fucking job to tell them . . . it's your fucking job."

After this incident, on or about December 26, 2000, the defendant's insurance carrier, Liberty Mutual Insurance Company (Liberty Mutual), sent a letter to the plaintiff's physician, stating: "Unless [the plaintiff] is eventually able to stand for up to a [ten] hour shift and repetitively lift cases with maximum weight of [forty-five pounds], [the defendant] will no longer be able to continue his employment . . . . In your opinion, will [the plaintiff] ever be able to repetitively lift [forty-five pound] cases and will he ever be able to stand for up to a [ten] hour shift work day?" In response to this inquiry, Kime faxed back a copy of that same letter with "NO" written on the bottom, but provided no other information.

Thereafter, in a report to Liberty Mutual dated February 6, 2001, Kime wrote that the plaintiff could increase his shift to ten hours a day and likely would be able to

reach "full duty work activity," including lifting forty-five pound cases repetitively. Ultimately, the plaintiff was able to work a full ten hour shift, but continued to have restrictions on his ability to lift full cases of liquor. In a letter to the defendant dated March 7, 2001, however, Kime indicated that the plaintiff had not improved as expected and that his light duty restriction—ten hours a day with no repetitive bending or lifting of objects more than twenty-five pounds—likely would be "permanent."

Subsequently, the plaintiff placed his name on the bid list for a night shift warehouse position. Although the plaintiff attests that he was high enough on the seniority list to qualify for this position, he did not receive the position. The defendant terminated the plaintiff's employment, informing him by letter dated April 17, 2001, that it had determined that there was no suitable position for him. Approximately two days later, the plaintiff's attorney sent a letter to one of the defendant's managers, Richard Conroy, advising him of the defendant's obligation to provide reasonable accommodation under the law, asking to be provided with a cost-benefit analysis of the decision to terminate the plaintiff, and requesting that the defendant reconsider its termination decision. The record does not reveal that the defendant took further action or reconsidered its decision.

The record also contains the following relevant procedural history. The plaintiff thereafter filed a six count complaint, alleging disparate treatment on the basis of disability in violation of § 46a-60 (a) (1), a failure to accommodate his disability in violation of both the act and the federal Americans with Disabilities Act of 1990 (ADA), 42 U.S.C. § 12101 et seq., and retaliation in violation of the act and the ADA. The defendant had the case removed to federal court and moved for summary judgment on all of the plaintiff's claims. The United

States District Court for the District of Connecticut granted the defendant's motion for summary judgment.[4] In response to a subsequent motion for reconsideration by the plaintiff, however, the District Court vacated its previous order with respect to the state law claims and remanded those claims to state court. The defendant then moved for summary judgment on the state law claims in state court. Instead of filing a substantive opposition, however, the plaintiff filed a "Preliminary Opposition to Defendant's Motion for Summary Judgment," contending that the defendant's motion already had been denied by the District Court and thus could not be refiled in state court. The defendant filed a reply to the plaintiff's procedural opposition and, subsequently, a motion to reclaim its motion for summary judgment. Although the defendant requested oral argument on its motion for summary judgment, the trial court neither heard argument nor responded to the plaintiff's procedural objection.

Instead, the trial court issued a memorandum of decision granting the defendant's motion for summary judgment. In so doing, it first concluded that the plaintiff was disabled within the meaning of General Statutes § 46a-51 (15).[5] It then analyzed the plaintiff's disparate treatment claim under the act using the burden-shifting framework provided in *McDonnell Douglas Corp.* v. *Green,* 411 U.S. 792, 802–804, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), and concluded that the plaintiff had not met his burden to provide evidence to establish each

[4] The District Court dismissed the federal claims on the ground that the plaintiff was not disabled within the meaning of the ADA. It dismissed the state claims on the same ground with no independent analysis.

[5] General Statutes § 46a-51 (15) provides: " 'Physically disabled' refers to any individual who has any chronic physical handicap, infirmity or impairment, whether congenital or resulting from bodily injury, organic processes or changes or from illness, including, but not limited to, epilepsy, deafness or hearing impairment or reliance on a wheelchair or other remedial appliance or device . . . ."

of the elements of his prima facie case; specifically, that he had failed to prove that he was qualified for the position. The trial court concluded that the pertinent position was that of truck driver, not split line warehouse worker, reasoning, on the basis of the Seventh Circuit Court of Appeals decision in *Malabarba* v. *Chicago Tribune Co.*, 149 F.3d 690, 696 (7th Cir. 1998), that the "qualifications of an injured worker should be measured against his original position, rather than a temporary position assigned as a result of his injury." It concluded that, "[t]o hold otherwise would be to depart from . . . [a] long-standing recognition that the ADA does not require that employers transform temporary work assignments into permanent positions." (Internal quotation marks omitted.) The trial court concluded that, in the alternative, the plaintiff also had failed to provide evidence that he was qualified for the "split line position." In this regard, the trial court concluded that the plaintiff had failed to proffer any evidence to show that he could perform the essential functions of that job: lifting objects more than a certain weight; "significant bending"; and "stretching overhead."

Next, the trial court determined that the plaintiff had not presented any evidence that the defendant had failed to accommodate his disability. Although the trial court recognized that the prohibition on disability discrimination in § 46a-60 (a) (1) does not expressly impose such a duty, it concluded that the statute imposes an implicit duty on the employer to " 'reasonably accommodate' " its disabled employees. The trial court reasoned that "the failure to impose upon state actions so prominent a federal requirement as the duty to reasonably accommodate would vitiate the remedial purposes of the Connecticut antidiscrimination statutes." (Internal quotation marks omitted.) The trial court nonetheless accepted the defendant's assertions

that "the only accommodation requested by the plaintiff was having another employee assist him on a permanent basis with retrieving full cases, which would have aided the plaintiff in performing only one of the several essential job functions that he was unable to perform because of his injury." Because the court determined that the "plaintiff's opposition [was] devoid of any documentation that contradict[ed] the factual assertions made by the defendant," it granted the defendant's motion for summary judgment on the plaintiff's failure to accommodate claim.[6]

The plaintiff then appealed from the trial court's judgment to the Appellate Court, raising procedural objections and contesting the merits of the trial court's ruling, but only as to the reasonable accommodation and disparate treatment claims. See footnote 6 of this opinion. The Appellate Court did not reach the merits of the appeal, but concluded that the trial court had abused its discretion in granting the defendant's motion for summary judgment solely on the basis of the defendant's pleadings and ignoring the parties' right to oral argument under Practice Book § 11-18. *Curry* v. *Allan S. Goodman, Inc.*, 95 Conn. App. 147, 152–53, 895 A.2d 266 (2006). It therefore reversed the judgment and remanded the case to the trial court with direction to hold a hearing and to allow oral argument on the defendant's motion for summary judgment. Id., 154.

On remand, the trial court—having then received the plaintiff's "substantive opposition" to the defendant's motion with documentary attachments—held a hearing.

---

[6] The trial court also granted the defendant's motion for summary judgment on the plaintiff's claim of retaliation for a union grievance filed by the plaintiff in October, 2000. The trial court agreed with the defendant that this claim was preempted by the federal National Labor Relations Act. The trial court's ruling on this claim is not before us on appeal, as it was abandoned on the plaintiff's first appeal to the Appellate Court. See *Curry* v. *Allan S. Goodman, Inc.*, 95 Conn. App. 147, 895 A.2d 266 (2006).

Thereafter, the trial court readopted its earlier decision, finding that the parties' positions were "substantially the same as in the original papers filed with the court." The court expressly relied on the September 14, 2004 letter from Kime stating that the plaintiff had made no significant improvement and was "restricted to sedentary only activity with no prolonged sitting or standing greater than [fifteen] minutes." The court made no mention of a detailed report from Robb D. Wright, an occupational therapist who had evaluated the plaintiff and concluded that the plaintiff could "complete the essential duties of both the [s]olid [l]ine and the [s]plit [l]ine." Although the trial court acknowledged the record and other documentation that the plaintiff had submitted as part of its substantive opposition, the trial court did not address any of that material in its second memorandum of decision.[7] The plaintiff again appealed from the trial court's judgment to the Appellate Court, and we thereafter transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

On appeal, the plaintiff asserts two primary challenges to the trial court's decision. First, the plaintiff contends that the trial court improperly concluded as a matter of law that he could not perform "the essential functions of the job" with or without reasonable accommodation. The plaintiff submits that the failure of the defendant to consult with him regarding a reasonable accommodation alone is grounds for denying the defendant's motion for summary judgment. The plaintiff also

[7] We note that the defendant filed a motion to strike certain of the plaintiff's exhibits appended to his substantive opposition to the defendant's motion for summary judgment, including the letter from Wright, because, inter alia, those exhibits did not comply with Practice Book § 17-45 et seq. The record reveals no evidence that the trial court ruled on this motion. Instead, the trial court stated at the hearing on the motion for summary judgment that it would take the plaintiff's substantive response to the defendant's motion into account in its ruling.

maintains that the trial court should have analyzed reasonable accommodation with regard to the warehouse position, not the truck driver position, and that there was a disputed issue of material fact as to whether the plaintiff could perform the essential functions of the split line job with reasonable accommodation. Second, he contends that the trial court improperly dismissed his disparate treatment claim because he had failed to show an issue of material fact as to whether he was a qualified person with a disability.[8] The plaintiff contends that he was terminated pursuant to a policy that facially discriminates against the permanently disabled by excluding the possibility of any reasonable accommodation. The plaintiff contends that, because this policy is *direct* evidence of disability discrimination, the trial court improperly applied the burden-shifting framework developed by the Supreme Court in *McDonnell Douglas Corp.* v. *Green*, supra, 411 U.S. 802–804, instead of the mixed-motive framework in *Price Waterhouse* v. *Hopkins*, 490 U.S. 228, 109 S. Ct. 1775, 104 L. Ed. 2d 268 (1989). We agree that the trial court improperly granted the defendant's motion for summary judgment and, accordingly, we reverse the trial court's judgment.

As an initial matter, we note that we address the plaintiff's claims under our well settled standard of review. A court shall render summary judgment "if the pleadings, affidavits and any other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Practice Book § 17-49. "In deciding a motion for summary judgment, the trial court must view the evidence in the light most favorable to the nonmoving party. . . . The party moving for summary judgment has the burden of showing the absence of

---

[8] Under the ADA, a qualified individual with a disability is one who is capable of performing the essential functions of the desired job with or without reasonable accommodation. 42 U.S.C. § 12111 (8).

any genuine issue of material fact and that the party is, therefore, entitled to judgment as a matter of law. . . . The test is whether the party moving for summary judgment would be entitled to a directed verdict on the same facts. . . . Our review of the trial court's decision to grant the defendant's motion for summary judgment is plenary." (Internal quotation marks omitted.) *Mazurek* v. *Great American Ins. Co.*, 284 Conn. 16, 26–27, 930 A.2d 682 (2007).

## I

We begin with the plaintiff's claim that the defendant violated § 46a-60 (a) (1) by failing to make a reasonable accommodation for his disability, whether by offering the assistance of another worker or by other means, that would have enabled him to perform all the essential functions necessary to work in the warehouse on the split line. The plaintiff contends that summary judgment was improper on this claim because he had made the requisite showing that he would have been able to do the split line job with proposed accommodations and that the defendant failed to engage him in the requisite interactive process that would have determined a mutually agreeable accommodation. The defendant contends in response that it already had determined with the plaintiff's union representative in 2000 that the plaintiff's assignment to the split line would be temporary, and that it was not legally required to provide permanent light duty work to the plaintiff. The defendant also contends that the plaintiff's undisputed medical restrictions established that it had no suitable positions or accommodations available for him. We are not persuaded by the defendant's contentions.

## A

The trial court concluded, and the defendant no longer disputes, that the act implicitly imposes the same duty on employers to provide reasonable accommoda-

tion to disabled individuals that expressly is required under the federal ADA. As the trial court noted, however, this court previously has declined to consider this question. See *Adriani* v. *Commission on Human Rights & Opportunities*, 220 Conn. 307, 320 n.12, 596 A.2d 426 (1991) ("[w]e do not address whether the provisions of . . . § 46a-60 [a] [1] . . . are coextensive with the provisions of the [ADA], especially the 'reasonable accommodation' duty under that statute"), on appeal after remand, 228 Conn. 545, 636 A.2d 1360 (1994). Because this question is an essential predicate to our analysis of the plaintiff's claim in the present case, we address this issue and resolve it in the affirmative.

Although this court never has addressed whether § 46a-60 (a) imposes a duty on employers to provide reasonable accommodation to their disabled employees, the question has been addressed by the commission on human rights and opportunities (commission), which, pursuant to General Statutes §§ 46a-54 and 46a-56, is charged with effectuating the provisions of the act. We traditionally have accorded deference to the time-tested interpretation of an agency charged with enforcing the provisions of a statute, provided that "the agency's interpretation has been formally articulated and applied for an extended period of time, and that interpretation is reasonable."[9] *Hartford* v. *Hartford Municipal Employees Assn.*, 259 Conn. 251, 262, 788 A.2d 60 (2002); see also *Longley* v. *State Employees Retirement Commission*, 284 Conn. 149, 164, 931 A.2d 890 (2007) ("this court has long adhered to the principle that when a governmental agency's time-tested interpretation [of a statute] is reasonable it should be

[9] Although this case is not an administrative appeal from an agency decision, we see no reason why the same principles of analysis should not apply here when addressing the construction of a statute by the agency charged with its enforcement.

accorded great weight by the courts" [internal quotation marks omitted]).

For at least the past twelve years, the commission consistently has articulated that § 46a-60 includes a duty of reasonable accommodation. See, e.g., *Cosme* v. *Sunrise Estates, LLC*, Commission on Human Rights & Opportunities, Opinion No. 0510210 (June 29, 2007); *Dwyer* v. *Yale University*, Commission on Human Rights & Opportunities, Opinion Nos. 0130315 and 0230323 (November 29, 2005); *Nobili* v. *Purdy & Co.*, Commission on Human Rights & Opportunities, Opinion No. 0120389 (February 6, 2004); *Saksena* v. *Dept. of Revenue Services*, Commission on Human Rights & Opportunities, Opinion No. 9940089 (August 9, 2001); *Charette* v. *Dept. of Social Services*, Commission on Human Rights & Opportunities, Opinion Nos. 9810371 and 9810581 (April 26, 2001); *Clark* v. *Wal-Mart Stores, Inc.*, Commission on Human Rights & Opportunities, Opinion No. 9830599 (January 25, 2001); *Secondo* v. *Housing Authority*, Commission on Human Rights & Opportunities, Opinion No. 9710713 (June 9, 2000); *Shulman* v. *Professional Help Desk*, Commission on Human Rights & Opportunities, Opinion No. 9720041 (June 7, 2000); *Grant* v. *Yale-New Haven Hospital*, Commission on Human Rights & Opportunities, Opinion No. 9530477 (October 13, 1999); *Duarte* v. *Hamilton Standard*, Commission on Human Rights & Opportunities, Opinion No. 9610553 (September 30, 1999); *Perez* v. *Dept. of Mental Health & Addiction Services*, Commission on Human Rights & Opportunities, Opinion No. 9140290 (August 27, 1997); *McDougall* v. *Textron Lycoming, Inc.*, Commission on Human Rights & Opportunities, Opinion No. 9320453 (October 6, 1997); *Kochey* v. *Eastman Kodak Co.*, Commission on Human Rights & Opportunities, Opinion No. 8310319 (May 1, 1996).

Indeed, although the enactment of the language in § 46a-60 that protects the physically disabled predates the ADA, our research has revealed that the commission imposed a reasonable accommodation duty nearly thirty years ago in 1978 in at least one case. In *LaRoche* v. *United Technologies Corp.*, Commission on Human Rights & Opportunities, Opinion No. FEP-PD-60-1 (August 28, 1978), the plaintiff, who was deaf, had requested an interpreter for a grievance proceeding as an accommodation from his employer. In interpreting the act, the commission stated: "The scope of affirmative obligations imposed upon employers by the [act] is an issue of concern and one that does not lend itself to any easy resolution. . . . A reading of the statute which imposes upon employers an obligation to take reasonable steps to accommodate the needs of the physically disabled has merit, for it would require employers to make any accommodations which are not unduly burdensome, while not imposing upon them a duty to make costly and time-consuming accommodations. . . . [T]his tribunal finds that there is sufficient evidence to conclude that the respondent has violated [the act] . . . by its refusal to permit the attendance of a[n] . . . interpreter . . . . This tribunal further finds that the relief requested by the complainant is a reasonable accommodation to the complainant's deafness." Id., 11.

Several trial courts also have endorsed the commission's interpretation, explicitly citing to its decisions. *Cimino* v. *Pratt & Whitney*, Superior Court, judicial district of New Haven, Docket No. CV 07-5011977S, 2007 WL 4577957 (November 29, 2007); *Trimachi* v. *Workers' Compensation Commission*, Superior Court, judicial district of New Haven, Docket No. CV 97-0403037S (June 14, 2000); see also *Ezikovich* v. *Commission on Human Rights & Opportunities*, 57 Conn. App. 767, 774–75, 750 A.2d 494 (2000) (applying ADA framework of reasonable accommodation to § 46a-60

claim in case wherein duty of reasonable accommodation was not contested), cert. denied, 253 Conn. 925, 754 A.2d 796 (2000). We conclude that the commission's interpretation is time-tested and thus entitled to deference. That conclusion, however, does not end the inquiry. We also must determine whether the commission's interpretation is reasonable. *Longley* v. *State Employees Retirement Commission,* supra, 284 Conn. 164. In so doing, we apply our established rules of statutory construction. General Statutes § 1-2z; *C. R. Klewin Northeast, LLC* v. *Fleming,* 284 Conn. 250, 261, 932 A.2d 1053 (2007).

"When . . . a statutory provision is silent with respect to [the issue at hand], our analysis is not limited by . . . § 1-2z, which provides that the meaning of statutes shall be ascertained from only their text and their relationship to other statutes if those sources reveal an unambiguous meaning that is not absurd or unworkable. Cf. *Asylum Hill Problem Solving Revitalization Assn.* v. *King,* 277 Conn. 238, 246–48, 890 A.2d 522 (2006). In addition to the words of the statute itself, 'we look to . . . the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter.' *Eder Bros., Inc.* v. *Wine Merchants of Connecticut, Inc.,* 275 Conn. 363, 372, 880 A.2d 138 (2005)." *Rollins* v. *People's Bank Corp.,* 283 Conn. 136, 141, 925 A.2d 315 (2007). We also note that, although it has not adopted the reasonable accommodation requirement, this court previously has determined that Connecticut antidiscrimination statutes should be interpreted in accordance with federal antidiscrimination laws. See, e.g., *Jackson* v. *Water Pollution Control Authority,* 278 Conn. 692, 705–709, 900 A.2d 498 (2006) (applying federal antidiscrimination jurisprudence in disability case); *Levy* v. *Commission*

*on Human Rights & Opportunities*, 236 Conn. 96, 102–103, 671 A.2d 349 (1996) (same); *Wroblewski* v. *Lexington Gardens, Inc.*, 188 Conn. 44, 53, 448 A.2d 801 (1982) ("confirm[ing] our legislature's intention 'to make the Connecticut [antidiscrimination] statute coextensive with the federal' " law when addressing sex discrimination); *Pik-Kwik Stores, Inc.* v. *Commission on Human Rights & Opportunities*, 170 Conn. 327, 331, 365 A.2d 1210 (1976) (addressing claim of sex discrimination but stating principle of reliance on federal law broadly to apply to all protected classes then enumerated in § 46a-60—race, color, national origin or sex).

We begin with the text of the statute. General Statutes § 46a-60 (a) provides in relevant part: "It shall be a discriminatory practice in violation of this section: (1) For an employer . . . except in the case of a bona fide occupational qualification or need, to refuse to hire or employ or to bar or to discharge from employment any individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment because of the individual's . . . present or past history of mental disability, mental retardation, learning disability or physical disability, including, but not limited to, blindness . . . ." On its face, the statute admits of no reasonable accommodation requirement. Cf. 42 U.S.C. § 12112 (b) (5) (A) (discrimination on basis of disability under ADA includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity").

Although the statute makes no mention of "reasonable accommodation," it does include a bona fide occupational qualification (BFOQ) defense to discrimination—i.e., "except in the case of a [BFOQ]

or need . . . ." General Statutes § 46a-60 (a) (1); see also *Levy* v. *Commission on Human Rights & Opportunities*, supra, 236 Conn. 102–103 (discussing application of BFOQ in disability context). We therefore first consider the meaning of a BFOQ, namely, whether such qualification may be interpreted as either coextensive, or inconsistent, with a reasonable accommodation requirement for individuals with physical disabilities. As the court previously has recognized, a BFOQ is an all or nothing proposition that legitimately links the qualifications of the job directly to a protected trait under the statute, thereby categorically excluding individuals in the protected class. *Evening Sentinel* v. *National Organization for Women*, 168 Conn. 26, 36, 357 A.2d 498 (1975) ("[a] BFOQ exists only if no member of the class excluded is physically capable of performing the tasks required by the job"). A BFOQ is an affirmative defense that the employer has the burden of proving after the employee has made a prima facie case of discrimination. See, e.g., *Healey* v. *Southwood Psychiatric Hospital*, 78 F.3d 128, 131 (3d Cir. 1996) ("[i]n a disparate treatment case, the defendant's affirmative defense is that its policy, practice, or action is based on a . . . BFOQ" [internal quotation marks omitted]); *Sarni Original Dry Cleaners, Inc.* v. *Cooke*, 388 Mass. 611, 617, 447 N.E.2d 1228 (1983) ("A BFOQ is an affirmative defense. The burden of proving the defense is on the employer.").

Whereas a BFOQ is an affirmative defense that focuses on general job requirements applicable to all employees, under federal law, reasonable accommodation is a part of the employee's prima facie case that focuses on an individual employee's particular disability and the job requirements—i.e., that, despite their protected trait, they will be able to perform the essential functions of the job with some type of assistance. Under this framework, if the employee makes such a showing,

then the burden of production shifts to the employer to show that the accommodation would constitute an undue hardship. *US Airways, Inc.* v. *Barnett*, 535 U.S. 391, 401–402, 122 S. Ct. 1516, 152 L. Ed. 2d 589 (2002) (discussing reasonable accommodation framework under ADA). A reasonable accommodation does not have to relate to the qualifications of the job. For example, an individual who can move around only with the aid of a wheelchair might be able to perform all the essential functions of a typist, but might not be able to work for an employer that had no wheelchair access to its facilities. See 1 B. Lindemann & P. Grossman, Employment Discrimination Law (2007 Ed.) p. 886 (listing examples of ergonomic reasonable accommodation under ADA). In this example, a BFOQ defense would not be relevant, but the employer would be permitted to show that construction of wheelchair access to a building would cause it to suffer an undue hardship under the reasonable accommodation framework. See *US Airways, Inc.* v. *Barnett*, supra, 402; see also *Levy* v. *Commission on Human Rights & Opportunities*, supra, 236 Conn. 102. We determine then that the BFOQ defense and the duty of reasonable accommodation for employers of individuals with disabilities are neither coextensive nor inconsistent. The statutory text does not speak to a duty of reasonable accommodation or other similar requirement. Nothing in the previous discussion, however, demonstrates that, by including a BFOQ defense, the legislature disclaimed a duty of reasonable accommodation. See General Statutes § 46a-60 (a); see also *C. R. Klewin Northeast, LLC* v. *Fleming*, supra, 284 Conn. 262 (concluding that text was ambiguous when it did not expressly speak to issue at hand). We therefore look to other sources in order to ascertain the intent of the legislature.

The legislative history of the act indicates that the statute was intended to provide strong protections for

those with disabilities. The language prohibiting employment discrimination because of "physical disability, including, but not limited to, blindness" was incorporated into § 46a-60 (a) (1) in 1973—*before* the ADA explicitly set forth the "reasonable accommodation" language and the federal courts developed the significant body of case law that now exists on the issue. See Public Acts 1973, No. 73-279, § 14. During the discussion of House Bill No. 8251, entitled "An Act Concerning the Rights of the Blind and Otherwise Physically Disabled," Senator Louise Berry asserted that the amendment's purpose was to "encourage and enable the blind and otherwise physically disabled to participate fully in a social and economic life of the state and to engage in renumerative employment . . . ." 16 S. Proc., Pt. 5, 1973 Sess., p. 2299. Representative Clyde O. Sayre stated in support: "This bill will eliminate discrimination of blind persons in the areas of housing, employment and public accommodation. . . . Regarding employment, this bill will protect the rights of the blind if they are *otherwise qualified* for employment." (Emphasis added.) 16 H.R. Proc., Pt. 8, 1973 Sess., p. 3656. Thus, these remarks indicate that the purpose of the bill was full inclusion in employment settings for otherwise qualified persons with physical disabilities.

The history of the act after 1973 indicates that the legislature further strengthened protections for the disabled. The legislature added disability related classifications to subsection (a) and expanded classifications already included. See Public Acts 1979, No. 79-480, § 1 (adding "present or past history of mental disorder"); Public Acts 1990, No. 90-330, § 3 (adding "learning disability"); Public Acts 2001, No. 01-28, § 8 (changing "mental disorder" to "mental disability"). Moreover, subsequent to the passage of the ADA in 1990, the legislature amended other related statutes to strengthen protections for the disabled in accordance with the ADA

itself. See Public Acts 2001, No. 01-28, § 9 (adding subsection [c] to General Statutes § 46a-77, requiring that state agencies comply with ADA "to the same extent that it provides rights and protections for persons with physical or mental disabilities beyond those provided for by the laws of this state").[10] Although Public Act 01-28 amended a different section in a different context, it specifically engrafts the requirements of the ADA, including reasonable accommodation, on state agencies.[11] Thus, our thorough review of the legislative history reveals a consistent intent to increase protections for individuals with disabilities.

Because the text and legislative history illustrate that the intent of the legislature is to stamp out discrimination on the basis of physical disability and a wide range of other disabilities (mental disability, learning disability, and mental retardation), we must not interpret the statute in a way that would thwart this purpose. See *In re William D.*, 284 Conn. 305, 317, 933 A.2d 1147 (2007) ("we read each statute in a manner that will not thwart its intended purpose" [internal quotation marks omitted]); *Kelly* v. *New Haven*, 275 Conn. 580, 616, 881 A.2d 978 (2005) ("It is axiomatic that we construe a

---

[10] This amendment was enacted shortly after the United States Supreme Court issued its decision in *Board of Trustees of the University of Alabama* v. *Garrett*, 531 U.S. 356, 374, 121 S. Ct. 955, 148 L. Ed. 2d 866 (2001), in which the court ruled that suits against states under title I of the ADA for money damages violated the eleventh amendment to the federal constitution. The amendment was sponsored by the commission, which already had been interpreting § 46a-60 (a) (1) in line with the ADA. See Report on Bills Favorably Reported by Committee, Judiciary, Senate Bill No. 1053 (February 5, 2001).

[11] General Statutes § 46a-70 was amended in 2001 to include "mental disability" and "marital status" as classes protected from discrimination by state officials and supervisory personnel in the employment of state personnel. Public Acts 2001, No. 01-28, § 2. During a hearing on that bill before the judiciary committee, Representative Robert Farr expressed concern that state agencies and contractors be given a defense of reasonable accommodation consistent with the ADA. Conn. Joint Standing Committee Hearings, Judiciary, Pt. 3, 2001 Sess., pp. 939–40.

statute in a manner that will not thwart its intended purpose or lead to absurd results. . . . We must avoid a construction that fails to attain a rational and sensible result that bears directly on the purpose the legislature sought to achieve." [Internal quotation marks omitted.]). Indeed, as the trial court reasoned, the "failure to impose upon state actions so prominent a federal requirement as the duty to reasonably accommodate would vitiate the remedial purposes of the Connecticut antidiscrimination statutes." (Internal quotation marks omitted.)

The legislature also has demonstrated a comprehensive approach to disability discrimination that supports the application of a duty to provide reasonable accommodation. In 1984, it voted in favor of amending article first, § 20, of our state constitution explicitly to include "physical or mental disability" as protected classes for purposes of equal protection, evidencing a strong intent to ensure equality for the disabled. Conn. Const., amend. XXI. The legislature has made similar statements in other statutes. See General Statutes § 46a-7 ("It is hereby found that the state of Connecticut has a special responsibility for the care, treatment, education, rehabilitation of and advocacy for its disabled citizens. Frequently the disabled are not aware of services or are unable to gain access to the appropriate facilities or services. It is hereby the declared policy of the state to provide for coordination of services for the disabled among the various agencies of the state charged with the responsibility for the care, treatment, education and rehabilitation of the disabled."); General Statutes § 4-61aa (b) (establishing committee to encourage employment of individuals with disabilities by state and requiring committee to "[1] [a]dvise, and develop written guidelines for . . . the *reasonable accommodation* of, persons with disabilities" [emphasis added]).

Finally, we note that a great majority of states has imposed a reasonable accommodation requirement with regard to their own antidiscrimination regimes. Some states have done so by judicial gloss. See, e.g., *Moody-Herrera* v. *Dept. of Natural Resources*, 967 P.2d 79, 87 (Alaska 1998) (engaging in exhaustive analysis of statutory text, legislative history, administrative guidance, and rules of other states to conclude that state law required reasonable accommodation); *McCaw Cellular Communications of Florida, Inc.* v. *Kwiatek*, 763 So. 2d 1063, 1065–66 (Fla. App. 1999) (concluding that state statute is interpreted consistent with ADA); *Noel* v. *Elk Brand Mfg. Co.*, 53 S.W.3d 95, 100–101 (Ky. App. 2000) (same). In other states, the administrative agency charged with enforcement has enacted a regulation that imposes a duty of reasonable accommodation. See, e.g., Haw. Code R. § 12-46-151 (Weil 2008); Ill. Admin. Code tit. 56, §§ 2500.20 and 2500.40 (West 2008); Iowa Admin. Code r. 161, § 8.27 (6) (2008); Mo. Code Regs. Ann. tit. 8, § 60-3.060 (G) (2008); N.J. Admin. Code § 13:13-2.5 (b) (2008); 16 Pa. Code § 44.14 (2008); Wash. Admin. Code § 162-22-025 (2) (2008); W. Va. Code R. § 77-1-4.5 (2008). Finally, other states have added an explicit requirement to their antidiscrimination statutes. See, e.g., Ariz. Rev. Stat. § 41-1463 (F) (4) (LexisNexis 2007); Cal. Govt. Code § 12940 (m) (Deering 2008); Colo. Rev. Stat. § 24-34-402 (1) (a) (2007); Idaho Code Ann. § 67-5909 (2007); Ind. Code Ann. § 22-9-5-7 (5) (LexisNexis 2007); Kan. Stat. Ann. § 44-1009 (a) (8) (2006); La. Rev. Stat. Ann. § 23:323 (B) (1) (2007); Mich. Comp. Laws § 37.1102 (LexisNexis 2008); Minn. Stat. Ann. § 363A.08 (2007); Mont. Code Ann. § 49-2-101 (19) (b) (2007); Neb. Rev. Stat. Ann. § 48.1107.02 (5) and (6) (LexisNexis 2007); N.H. Rev. Stat. Ann. § 354-A:7 (I) and (VII) (a) (LexisNexis 2008); N.M. Stat. Ann. § 28-1-7 (J) (LexisNexis 2007); N.Y. Exec. Law §§ 292 and 296 (c) (1) (Consol. 2008); N.C. Gen. Stat. § 168A-4 (2007); N.D.

Cent. Code § 14-02.4-03 (2007); Or. Rev. Stat. § 659A.112 (2) (e) (2005); R.I. Gen. Laws § 42-87-3 (2) (2007); S.C. Code Ann. § 1-13-80 (D) (2) (2006); Tex. Lab. Code § 21.128 (2006); Utah Code Ann. § 34A-5-106 (2007); Vt. Stat. Ann. tit. 21, § 495d (2007); Va. Code Ann. § 51.5-41 (c) (2007); Wis. Stat. Ann. § 111.34 (1) (b) (2006); Wyo. Stat. Ann. § 27-9-105 (d) (2007). For the foregoing reasons, we conclude that the commission has applied a reasonable interpretation to § 46a-60 (a) (1). Accordingly, we adopt the commission's time-tested interpretation construing § 46a-60 (a) (1) to require employers to make a reasonable accommodation for an employee's disability.

B

We next analyze the plaintiff's reasonable accommodation claim within this framework. Although this case is based solely on Connecticut law, we review federal precedent concerning employment discrimination for guidance in enforcing our own antidiscrimination statutes. See *Perodeau* v. *Hartford*, 259 Conn. 729, 738, 792 A.2d 752 (2002); *Levy* v. *Commission on Human Rights & Opportunities*, supra, 236 Conn. 103.

"In order to survive a motion for summary judgment on a reasonable accommodation claim, the plaintiff must produce enough evidence for a reasonable jury to find that (1) he is disabled within the meaning of the [statute], (2) he was able to perform the essential functions of the job with or without a reasonable accommodation, and (3) [the defendant], despite knowing of [the plaintiff's] disability, did not reasonably accommodate it." (Internal quotation marks omitted.) *Freadman* v. *Metropolitan Property & Casualty Ins. Co.*, 484 F.3d 91, 102 (1st Cir. 2007) (citing elements under ADA); see also *Rodal* v. *Anesthesia Group of Onondaga, P.C.*, 369 F.3d 113, 118 (2d Cir. 2004) (same); *Ezikovich* v. *Commission on Human Rights & Opportunities*,

supra, 57 Conn. App. 774 (same). If the employee has made such a prima facie showing, the burden shifts to the employer to show that such an accommodation would impose an undue hardship on its business. *Freadman* v. *Metropolitan Property & Casualty Ins. Co.*, supra, 103.

Once a disabled individual has suggested to his employer a reasonable accommodation, federal law requires, and we agree, that the employer and the employee engage in an "informal, interactive process with the qualified individual with a disability in need of the accommodation . . . [to] identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations." 29 C.F.R. § 1630.2 (o) (3). In this effort, the employee must come forward with some suggestion of accommodation, and the employer must make a good faith effort to participate in that discussion. See *Humphrey* v. *Memorial Hospitals Assn.*, 239 F.3d 1128, 1137 (9th Cir. 2001), cert. denied, 535 U.S. 1011, 122 S. Ct. 1592, 152 L. Ed. 2d 509 (2002); see also *Saksena* v. *Dept. of Revenue Services*, supra, Commission on Human Rights & Opportunities, Opinion No. 9940089 (citing employer's duty to engage in interactive process in good faith).

Turning to the present case, there is no longer a dispute about whether the plaintiff is disabled within the meaning of the state act or whether, with regard to the third prong of the accommodation claim analysis, the defendant was aware of the plaintiff's disability. Indeed, in this case, we are presented with a situation in which the defendant already had been accommodating the plaintiff for some time, but ultimately determined that it could no longer do so. This temporary accommodation does not circumvent, however, the requirement to make a good faith effort to engage in an interactive process, if the employee so requests, to

determine whether the employer might make some other reasonable accommodation on a more permanent basis.

In the present case, the plaintiff made an affirmative request to continue working the warehouse night shift in March, 2001. In addition, the plaintiff's counsel, in his April 19, 2001 letter to the defendant, requested that the defendant: (1) reconsider its decision; (2) provide a cost-benefit analysis supporting its decision to terminate the plaintiff; and (3) continue to grant the plaintiff the accommodation of having another worker assist him when it became necessary to retrieve boxes that weighed more than the plaintiff's lifting restrictions.[12] These actions satisfy the plaintiff's burden of initiating the interactive process. See *Miller* v. *Illinois Dept. of Corrections*, 107 F.3d 483, 486–87 (7th Cir. 1997) ("[e]ven if an employee who . . . becomes disabled while employed just says to the employer, 'I want to keep working for you—do you have any suggestions?' the employer has a duty . . . to ascertain whether he has some job that the employee might be able to fill"). The defendant's response to this request was merely to reject it. Conroy, the defendant's manager, stated during his deposition that, upon receiving the letter from the plaintiff's counsel, he did not reconsider his decision, confer with anyone else, review any records, or conduct any investigation or cost-benefit analysis of the hardship that the proposed accommodation would cause the defendant. The record reflects no effort by Conroy or any other representative of the defendant to

---

[12] The letter from the plaintiff's counsel provided in relevant part: "There are times occasionally when 'split line' workers need to lift and carry a box weighing more than [twenty-five] pounds. In those instances, over the last seven months, someone has been able to assist [the plaintiff] with that task. With this minimal accommodation, [the plaintiff] has performed his job quite well for the last seven months. At no time have these restrictions or the need for this minor accommodation caused any undue hardship on your company."

contact the plaintiff or his counsel to engage in any additional, meaningful discussion.[13]

We conclude that this response is clearly not the dialogue envisioned by the interactive reasonable accommodation process and the defendant's duty of good faith compliance. *Parker* v. *Columbia Pictures Industries*, 204 F.3d 326, 338 (2d Cir. 2000) (request for accommodation does not "force an employer to investigate every aspect of an employee's condition before terminating him based on his inability to work . . . [but at] the very least . . . triggers a responsibility on the employer's part to investigate that request and determine its feasibility"), rev'd in part on other grounds, 260 F.3d 100, 104 (2001); *Katz* v. *City Metal Co.*, 87 F.3d 26, 33 (1st Cir. 1996) (judgment as matter of law improper in part because employer rejected "out of hand" former employee's suggested accommodation of reduced work schedule and salary); *Witt* v. *Northwest Aluminum Co.*, 177 F. Sup. 2d 1127, 1133 (D. Or. 2001) (defendant employer did not satisfy mandatory requirement of engaging in "meaningful" interactive process by rejecting plaintiff's proposed accommodation and merely suggesting that he bid on other jobs). Failure of the employer to engage in the interactive process alone may be sufficient grounds for denying a defendant's motion for summary judgment, because it is, at least, some evidence of discrimination. *Ballard* v. *Rubin*, 284 F.3d 957, 960 (8th Cir. 2002) (concluding when construing federal Rehabilitation Act of 1973, 29 U.S.C. § 701 et seq., in accordance with ADA decisions that "[t]he mere failure of an employer to engage in the interactive process does not give rise to per se liability, although for summary judgment purposes such failure

---

[13] The fact that the defendant negotiated with a union representative when the plaintiff originally and temporarily was placed on the split line does not, as the defendant contends, relieve it of an obligation to negotiate in good faith with the plaintiff about a permanent accommodation.

is considered prima facie evidence that the employer may be acting in bad faith"); *Taylor* v. *Phoenixville School District*, 184 F.3d 296, 318 (3d Cir. 1999) ("[w]hen an employee has evidence that the employer did not act in good faith in the interactive process, however, we will not readily decide on summary judgment that accommodation was not possible and the employer's bad faith could have no effect"); *Williams* v. *British Airways, PLC*, United States District Court, Docket Nos. 04-CV-0471, 06-CV-5085, 2007 WL 2907426, *9 (E.D.N.Y. September 27, 2007) ("[f]ailure of an employer to act in good faith will preclude summary judgment against an employee on a claim of failure to accommodate" [internal quotation marks omitted]).

### C

Although such evidence of discrimination could provide ample basis to reverse the trial court's grant of summary judgment, there is another more salient issue of material fact regarding whether the plaintiff is able with or without reasonable accommodation to perform the essential functions of the job. In order to survive summary judgment on a reasonable accommodation claim, the plaintiff has the burden of showing that an accommodation would enable him to perform the functions of the job and that, "at least on the face of things," it is feasible for the employer to provide the accommodation. (Internal quotation marks omitted.) *US Airways, Inc.* v. *Barnett*, supra, 535 U.S. 401–402. The trial court concluded that the pertinent position to be analyzed was that of truck driver, not night warehouse employee working on the split line. As the ADA specifically provides and the United States Supreme Court has emphasized, job restructuring or transfer to an open position may constitute reasonable accommodation, provided that such transfer does not interfere with a seniority system. 42 U.S.C. § 12111 (9); *US Airways, Inc.* v. *Barnett*, supra, 405–406. The plaintiff had applied

for a night warehouse position and wished to remain on the split line, clearly indicating that this would be a reasonable accommodation for his disability. The defendant denied the application and instead terminated the plaintiff on the basis of his disability.[14] Thus, the proper question before the trial court was whether the plaintiff could perform the essential functions, as the defendant has listed them in a sworn affidavit, for a night warehouse employee working on the split line,[15] namely: picking bottles of liquor from four different height levels, putting the bottles in cases, lifting cases of twenty-five pounds and heavier, and assisting in other capacities in the warehouse as needed.[16]

---

[14] The defendant and the trial court rely heavily on *Malabarba* v. *Chicago Tribune Co.*, supra, 149 F.3d 697, wherein the court stated: "Although the ADA provides that reassignment to a vacant position may constitute a reasonable accommodation, it does not require that employers convert temporary 'light-duty' jobs into permanent ones." *Malabarba* is inapposite, however, because the facts in that case contrast starkly with those here. In *Malabarba*, the employer attempted to find permanent work for an employee, who had injured his back and leg, in approximately four separate positions, before terminating him. See id., 694–95. In addition, it was uncontested that the employee in *Malabarba* could not perform all the functions or was not otherwise qualified for *all* of the positions that the defendant employer attempted to find for him. Id., 698. The present case is different in that the defendant did not seriously seek a permanent accommodation for the plaintiff and simply terminated him when it appeared that his disability was permanent.

Moreover, we note that this is not a situation wherein an employee seeks a transfer to a job for which there was no opening. As we stated previously, in March, 2001, the plaintiff had applied for reassignment to the warehouse consistent with the defendant's policy that every six months employees normally bid on such positions on the basis of their seniority. That application, along with the basis for its denial, is the adverse employment action that the defendant essentially is contesting.

[15] The plaintiff asserts that he had sufficient seniority to bid successfully for this position. He also asserts that, in March, 2001, when the bid list for the split line was posted again, the three open slots ultimately were taken by individuals with less seniority than him. We draw no conclusions as to these assertions, except to note that, if they are in dispute, summary judgment would not be appropriate.

[16] We assume without deciding that these are the essential functions of the job. The plaintiff presented evidence in the form of his own affidavit and Schreiber's deposition that repetitive lifting of heavy cases is not a regular occurrence in the split line warehouse job. The defendant's vice

To establish his prima facie case, the plaintiff has presented sworn evidence that, by the time of his termination, he could work a full ten hour shift and was capable of bending to pick up bottles from each of the levels without assistance. In addition, the plaintiff's affidavit provided: "Occasionally, it does occur that I would run out of a certain item on the line. In those instances, I can go to the various warehouses to obtain replacement stock. It is true that some cases of the indicated bottles [weigh] more than [twenty-five] pounds although some weigh less. I can retrieve them, however, by transferring those cases one or two bottles at a time to another box on a hand truck or fork lift. That process takes a bit more time than lifting the box all at once, but only a few more minutes." He also has presented a functional capacity evaluation,[17] which opines that the plaintiff can perform the functions associated with both the split *and* the solid lines.[18]

president, David Heller, asserted in an affidavit that this task and other odd tasks are integral heavy lifting tasks. Heller stated that all night shift workers were required "[to] fill customer orders, load the trucks for delivery, select cases for the split line, fill the solid line, put away stock, and perform general housekeeping. [The workers] are required to pick bottles, pick solid cases, load trucks, select cases for placement . . . remove empty boxes from a truck, tidy-up the warehouse, offload trailers . . . and create palletized loads . . . ." We recognize that strong consideration should be accorded to the interpretation of the employer in determining the essential functions of the job. See 42 U.S.C. § 12111 (8) ("consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job"); see also 29 C.F.R. § 1630.2 (n) (providing definition of "[e]ssential functions" with regard to implementing provisions of ADA). There does, however, also seem to be a genuine factual dispute over this issue in the present case.

[17] The plaintiff properly may rely on a functional capacity evaluation undertaken after his termination to show for purposes of summary judgment that he is a qualified individual with a disability. See footnote 18 of this opinion.

[18] The functional capacity evaluation, performed by Wright, an occupational therapist, provided: "The results of the [evaluation] indicated that [the plaintiff] could lift up to [sixty pounds] Frequently and [seventy-five pounds] Occasionally. Additionally, he demonstrated the ability to reach, bend and squat to the Frequent level. This capacity level would appear to exceed the physical requirements of both the Solid Line and the Split Line."

The defendant nevertheless contends that the plaintiff's medical restrictions made it clear that he could not perform the essential functions of the job, relying on the affidavits of its employees, such as its vice president, David Heller, and Conroy, who assert that the plaintiff would be unable to perform both the repetitive bending and heavy lifting functions required by the warehouse job. The defendant also relies upon letters from Kime dated March 7, 2001 and September 14, 2004, and a September 1, 2004 report[19] from Steven Seldon, another physician who had conducted an independent medical examination, all indicating that the plaintiff's restrictions were permanent, that he would not be able to engage in significant bending nor lift objects of between fifteen and twenty-five pounds, and that he was capable of performing only light sedentary work.

As our review of the record shows, the functional capacity evaluation; see footnote 18 of this opinion; conflicts starkly with the letters from Kime and the

[19] After-acquired evidence may not be used to prove an employer's *motivation* with respect to a prospective or current employee because the employer did not have those facts before it at the time that it made the contested decision. *McKennon* v. *Nashville Banner Publishing Co.*, 513 U.S. 352, 359–60, 115 S. Ct. 879, 130 L. Ed. 2d 852 (1995). After-acquired evidence may be considered, however, to support or to rebut the plaintiff's assertion in a disability discrimination case that he was qualified to perform the essential functions of the job with or without reasonable accommodation at the time of the adverse employment decision. *Matewski* v. *Orkin Exterminating Co.*, United States District Court, Docket No. CV-02-233-P-C, 2003 WL 21516577, *4 n.14 (D. Me. July 1, 2003) ("[T]he prohibition on after-acquired evidence addresses the evil of offering after-the-fact rationales for adverse employment actions. . . . No such problem arises in considering 'after-acquired' evidence for the purpose of assessing whether, as a threshold matter, an employee is [or was at the time of the adverse action] a 'qualified individual with a disability,' an issue as to which the plaintiff bears the burden of proof." [Citations omitted.]), aff'd, 2003 WL 22056378, *1 (D. Me. September 3, 2003). The likelihood or history of relapses or regression may also be relevant to this determination. *D'Amico* v. *New York*, 132 F.3d 145, 151 (2d Cir.) (discussing whether individual was qualified at time of termination within meaning of Rehabilitation Act of 1973), cert. denied, 524 U.S. 911, 118 S. Ct. 2075, 141 L. Ed. 2d 151 (1998).

report of Seldon as to whether the plaintiff can perform the split line functions.[20] This type of evidentiary dispute is inappropriate for resolution on summary judgment. Moreover, we note that none of Kime's letters opines on whether the accommodations suggested by the plaintiff are medically realistic, or indicates that Kime had studied the conditions of the workplace. Additionally, because the defendant did not engage the plaintiff in an interactive process to discuss accommodations of any sort, there has not been an attempt at achieving consensus on any of these issues. It is not for us to reconcile such disputes here. Indeed, the defendant has undertaken no significant analysis as to why there are absolutely no *reasonable* accommodations available for the plaintiff, or, rather, why any accommodation would constitute an undue hardship. Instead, it continues to rely on its own policy that all workers return to full duty with no restrictions, which we address in part II of this opinion.

Finally, the defendant contends, as a matter of law, that an employer need not create a permanent light duty position in order to accommodate an individual with a disability. See, e.g., *Turner* v. *Hershey Chocolate USA*, 440 F.3d 604, 614 (3d Cir. 2006) ("[t]he ADA does not require an employer to create a new position in order to accommodate an employee with a disability,

---

[20] The defendant points out that the letters from the physicians and other specialists constitute inadmissible hearsay, and we may not consider them for the truth of the matter asserted on a motion for summary judgment. *Cogswell* v. *American Transit Ins. Co.*, 282 Conn. 505, 533, 923 A.2d 638 (2007). We recognize that many of the documents relied upon by *both* sides constitute hearsay. We, however, may consider these documents only for the limited purposes of showing that the parties could produce such competent evidence at trial in the form of testimony from their respective experts. Moreover, we note that, in any event, these medical documents were based on personal examinations of the plaintiff, and the evaluation from Wright sets forth the findings and reasoning in adequate detail so as to bear sufficient guarantees of trustworthiness and reliability. *Barrett* v. *Danbury Hospital*, 232 Conn. 242, 251–52, 654 A.2d 748 (1995); see also Conn. Code Evid. § 8-9.

or transform a temporary light duty position into a permanent position"). This principle, however, does not permit the employer categorically to exclude disabled employees by labeling *any* restriction and its resulting accommodation light duty. *Otting* v. *J.C. Penney Co.*, 223 F.3d 704, 711–12 (8th Cir. 2000) (jury's determination that employer acted with "malice or reckless indifference" to employee's rights under ADA supported by evidence when manager testified it was defendant company's "policy not to allow employees with any restrictions to return to work" and made "no effort whatsoever to explore any possibility that would allow [the plaintiff] to return to work" [internal quotation marks omitted]). Our review of the record indicates that the primary disputed issue between the parties is not whether the plaintiff must remain on light duty as an accommodation for his disability, but whether he can perform the *essential* functions of a night warehouse employee who works the split line with or without a *reasonable* accommodation. It does not appear that the plaintiff is exclusively demanding an accommodation that effectively would eliminate one of the essential functions of the job he seeks and thereby create a permanent light duty position.

In conclusion, the materials submitted to the trial court by both parties reveal genuine issues of material fact concerning whether the plaintiff can perform the essential functions of the warehouse position with or without reasonable accommodation. Accordingly, we conclude that the trial court improperly granted the defendant's motion for summary judgment on the reasonable accommodation claim.

## II

The plaintiff next contends that the trial court applied the improper burden-shifting framework to his claim of disparate treatment on the basis of his disability.

Specifically, the plaintiff contends that the defendant's policy that requires all injured persons ultimately to return to full duty constitutes direct evidence of discrimination such that the mixed motive analysis applies. See *Levy* v. *Commission on Human Rights & Opportunities*, supra, 236 Conn. 107–108 (describing mixed motive analysis). The defendant contends that the plaintiff's claim about the proper framework is unreviewable because he failed to raise it in the trial court, and that, in any event, under either framework, there was no disputed issue of material fact as to whether the plaintiff was a qualified individual with a disability.

We agree with the defendant that the plaintiff failed to raise his arguments about the mixed motive versus circumstantial evidence frameworks at the trial court, thereby rendering that legal issue unreviewable. Following the remand from the Appellate Court, the plaintiff argued his case within the circumstantial evidence framework set forth in *McDonnell Douglas Corp.* v. *Green*, supra, 411 U.S. 802–804, and *Levy* v. *Commission on Human Rights & Opportunities*, supra, 236 Conn. 107–108. The plaintiff cannot now for the first time present a different claim on appeal. See *River Bend Associates, Inc.* v. *Conservation & Inland Wetlands Commission*, 269 Conn. 57, 82, 848 A.2d 395 (2004) ("[w]e have stated repeatedly that we ordinarily will not review an issue that has not been properly raised before the trial court" [internal quotation marks omitted]).

Regardless, the trial court improperly rendered summary judgment on the plaintiff's disparate treatment claim because, even under the *McDonnell Douglas Corp.* circumstantial evidence framework, there is— for the reasons we concluded in the context of the reasonable accommodation claim in part I C of this opinion—a genuine issue of material fact as to whether the plaintiff was a qualified individual with a disability

able to perform the essential functions of the job with or without reasonable accommodation.

In the disability context, a prima facie case for disparate treatment is established under the *McDonnell Douglas Corp.* framework if the plaintiff shows: "(1) he suffers from a disability or handicap, as defined by the [applicable statute]; (2) he was nevertheless able to perform the essential functions of his job, either with or without reasonable accommodation; and that (3) [the defendant] took an adverse employment action against him because of, in whole or in part, his protected disability."[21] *Tobin* v. *Liberty Mutual Ins. Co.*, 433 F.3d 100, 104 (1st Cir. 2005); *Gaul* v. *Lucent Technologies, Inc.*, 134 F.3d 576, 580 (3d Cir. 1998).

In the present case, the plaintiff made a showing as to all three elements. It is undisputed that he is disabled within the meaning of §§ 46a-51 (15) and 46a-60 (a) (1). As we noted in part I C of this opinion, he has stated a case that he could perform the essential functions of the job with reasonable accommodation. Finally, it is undisputed that the plaintiff's known disability was the sole reason for his discharge,[22] as the defendant has proffered no evidence that there was any other legitimate basis for its decision. In response, the defendant points to its own policy that workers may remain on light duty only temporarily.[23] These assertions present

---

[21] In demonstrating that one's disability was the reason for an adverse employment action, a plaintiff must, we think it clear, adduce some evidence that the employer was aware of the employee's disability. *Raytheon Co.* v. *Hernandez*, 540 U.S. 44, 54 n.7, 124 S. Ct. 513, 157 L. Ed. 2d 357 (2003).

[22] Not only does the letter terminating the plaintiff assert that his disability was the reason for the defendant's decision, but the plaintiff also has proffered evidence, albeit disputed, that his supervisor, O'Connor, made discriminatory comments directly related to his disability. There is no evidence, nor does the defendant claim, that the plaintiff's alleged comments in response to those of O'Connor had any bearing on the decision to terminate him.

[23] A policy—whether express or by application—that eliminates the individualized assessment of each disabled employee for purposes of reasonable accommodations is for all the reasons articulated in this opinion necessarily illegal. See also *McGregor* v. *National Railroad Passenger Corp.*, 187 F.3d

an issue of material fact. Thus, the plaintiff's disparate treatment claim should have survived summary judgment. The plaintiff is of course free to renew his claim upon remand that a different framework applies and that the defendant's policy is direct evidence of discrimination.[24]

The judgment is reversed and the case is remanded for further proceedings consistent with this opinion.

In this opinion the other justices concurred.

---

1113, 1116 (9th Cir. 1999) ("[a] '100 [perecent] healed' or 'fully healed' policy discriminates against qualified individuals with disabilities because such a policy permits employers to substitute a determination of whether a qualified individual is '100 [percent] healed' from their injury for the required individual assessment whether the qualified individual is able to perform the essential functions of his or her job either with or without accommodation"). Whether the plaintiff ultimately will prevail after an individualized assessment will depend on the interactive reasonable accommodation process.

[24] Indeed, under similar facts, a plaintiff could consider bringing this type of claim within other frameworks. For example, a plaintiff could employ a simple disparate treatment analysis and show that a defendant terminated him pursuant to a facially discriminatory or as applied policy against individuals with disabilities. See *Hazen Paper Co.* v. *Biggins,* 507 U.S. 604, 609–11, 113 S. Ct. 1701, 123 L. Ed. 2d 338 (1993) (discussing disparate treatment and disparate impact theories generally in context of case concerning federal Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621 et seq.); *Trans World Airlines, Inc.* v. *Thurston,* 469 U.S. 111, 121–22, 105 S. Ct. 613, 83 L. Ed. 2d 523 (1985) (transfer policy facially discriminatory).