******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

MICHAEL TOMICK *v.* UNITED PARCEL
SERVICE, INC., ET AL.
(AC 35896)

DiPentima, C. J., and Beach and Prescott, Js.

*Argued October 20, 2014—officially released May 19, 2015*

(Appeal from Superior Court, judicial district of New
London, Cosgrove, J.)

*Michael C. Harrington*, with whom were *Stella Szan-
tova Giordano* and, on the brief, *Jennifer A. Corvo*, for
the appellant-appellee (named defendant).

*Michael D. Colonese*, with whom, on the brief, was
*Cassie N. Jameson*, for the appellee-appellant
(plaintiff).

*Marc P. Mercier* filed a brief for the Connecticut
Employment Lawyers Association as amicus curiae.

*Charles Krich*, principal attorney, filed a brief for the
Commission on Human Rights and Opportunities as
amicus curiae.

*Opinion*

DiPENTIMA, C. J. This employment discrimination case returns to this court following our remand to the trial court for a determination of the "date of the adverse employment decision" and whether the plaintiff was qualified to perform the essential duties of his position at that time. *Tomick* v. *United Parcel Service, Inc.*, 135 Conn. App. 589, 613, 43 A.3d 722 (*Tomick I*), cert. denied, 305 Conn. 920, 47 A.3d 389 (2012). We instructed the court that it was "not precluded from reconsidering the issue of which analytical framework should be applied and what each framework requires the plaintiff to establish to make out a prima facie case." Id., 613 n.17. On appeal, the defendant United Parcel Service, Inc.,[1] argues that the trial court abused its discretion in denying the defendant's motion for a directed verdict because the plaintiff, Michael Tomick, failed to establish a prima facie case of disability discrimination pursuant to General Statutes § 46a-60.[2] Specifically, the defendant claims that the court erred in finding that (1) the adverse employment action occurred on December 1 or 2, 2004, and (2) the plaintiff was qualified to perform the essential functions of his job on that date. In his cross appeal, the plaintiff argues that the court improperly set aside the award of punitive damages on the ground that such an award was not authorized by General Statutes § 46a-104. We affirm the judgment of the court.

The plaintiff brought this employment discrimination action against the defendant, claiming, inter alia, that the defendant terminated his employment in violation of § 46a-60 (count six). The facts that the jury reasonably could have found were set forth by this court in *Tomick I* and are as follows: The plaintiff worked as a package car driver for the defendant. "On January 3, 2003, the plaintiff suffered a back injury during the course of his employment. He received a 13 percent permanent disability of his lumbar spine. The plaintiff took a leave of absence until November, 2003, when he returned to work with no restrictions.

"On November 30, 2004, the plaintiff reinjured his back when he stepped off a stoop while delivering a package. He sent an electronic message to the [defendant's Norwich] center informing the defendant of his situation and completed his route. That evening, [Kevin] Trudelle [the business manager of the defendant's Norwich/Niantic center] discussed the injury with Michael Hebert, the plaintiff's direct supervisor, and Hebert notified the defendant's insurance carrier of the accident.

"The next morning, December 1, the plaintiff was experiencing back pain. He called the center to request the day off to recover. Trudelle approved the absence and instructed the plaintiff to seek medical treatment. The plaintiff was examined at Pequot Medical Center,

where he indicated to the treating physician that he needed to be released for full duty because it was the peak season for the defendant's business. The plaintiff told the physician that he would be able to perform his job with a helper, and the physician released the plaintiff for full duty. The plaintiff called Trudelle to inform him that he was released for full duty and requested a helper for the day. Trudelle told the plaintiff that he would have a helper that day, but he did not then take any steps to ensure that the plaintiff would be assigned a helper to his route. . . .

"On December 2, the plaintiff returned to work. When he arrived that morning, he was told by both the preloader who was loading his truck and Hebert that he was going to have a helper. Because the plaintiff was returning to work after an injury, Hebert accompanied the plaintiff for a portion of his route that morning to evaluate his knowledge of safety methods, as was standard practice.

"After completing the training, Hebert instructed the plaintiff to meet a helper at a specified location at noon. The helper was not in the designated meeting location at that time, so the plaintiff contacted the center by electronic message. The plaintiff also called Trudelle to inquire about the helper. Trudelle told the plaintiff that it was the first he had heard that the plaintiff did not have a helper and transferred him to Mark Appleton, a human resources supervisor and the helper coordinator. Appleton was not aware that the plaintiff was supposed to be assigned a helper that day, but began looking for a helper.

"At that time, the plaintiff called his wife. He told her that he had not been assigned a helper that day and that he was in significant pain. He also told her he would be coming home for lunch, as was typical. The plaintiff then sent several messages to the center to communicate that he was going home for lunch, that he needed to come off the road and that he needed to see a physician. On the way to his home, the plaintiff received a message instructing him to call Trudelle immediately.

"When the plaintiff arrived home, he found his wife crying, and she told him that she had called Trudelle. The plaintiff's wife told Trudelle that she thought her husband was being singled out and that she thought he was going to have a nervous breakdown. Trudelle told the plaintiff's wife that the plaintiff was not being honest and that he had gone 'above and beyond' to help the plaintiff. The plaintiff called Trudelle from his home, as instructed, and told him that his back was still hurting and that he needed to see a physician. Trudelle told the plaintiff that if he 'couldn't do the fucking job, [to] bring the fucking truck back to the building.' Trudelle then asked if the plaintiff wanted anybody to come pick up the truck or if the plaintiff could drive it back to

the center. The plaintiff said he would bring the truck back after his lunch break.

"When the plaintiff returned to the center, he found another driver waiting to take over his route. The plaintiff was upset and in physical pain and went to speak with Trudelle. He asked Trudelle what was going on because he thought he was supposed to have a helper assigned to his route. Trudelle told the plaintiff that his wife had called and said that the plaintiff was having a nervous breakdown. The plaintiff said that he was at his wit's end and needed to see a physician because of his pain. Trudelle told the plaintiff that he was acting irrationally and that he would be sent for a fitness for duty test and a substance abuse test. The plaintiff was upset by this and told Trudelle that he was going to the medical clinic to be seen by a physician for his back pain. The plaintiff maintained that he would not go for a fitness for duty test, and Trudelle told him that if he did not go he could be fired. At that point, the plaintiff believed that his employment had been terminated.

"The plaintiff exited Trudelle's office and left the building yelling and swearing. As he exited, he telephoned his union steward but did not reach him. He then called his wife, who reviewed the collective bargaining agreement and told the plaintiff that refusing a fitness for duty test could be a ground for discharge. Trudelle followed the plaintiff to the parking lot. As the plaintiff reached the lot, supervisor Ray Congdon was walking up the driveway to the lot. Trudelle was on the telephone with [Charles A.] Sheahan, [a division manager] describing the situation. Per Sheahan's instructions, Trudelle informed the plaintiff that they would call the state police if he got into his car. Trudelle also told the plaintiff that he needed to accompany him for a fitness for duty test and drug test immediately. When the plaintiff again refused, Trudelle told him he was fired, and it was again the plaintiff's understanding that his employment had been terminated. The plaintiff, while standing approximately ten yards from Trudelle, said, 'I should have kicked your ass for what you said to my wife earlier today.' Trudelle then told Sheahan over the telephone that the plaintiff said he 'might kick [Trudelle's] ass,' and the plaintiff corrected him and said, 'I didn't say I was going to kick your ass. I said I shoulda.' When the plaintiff again refused to accompany Trudelle to the clinic, Congdon suggested, as an attempt to defuse the situation, that the plaintiff go with Congdon to the clinic instead and the plaintiff acquiesced.

"The plaintiff was seen at the clinic by Geraldine S. Ruffa, a physician. After examining the plaintiff, she did not find it necessary to administer a urinalysis drug test. The physician released the plaintiff back to work, but at a modified duty status with a lifting restriction of no more than fifteen pounds and minimum bending, squatting and twisting. She prescribed two medications

and reminded the plaintiff that he should not use them at work or drive while using them because they cause drowsiness. The plaintiff was to be reevaluated on December 8, 2004.

"Congdon called Trudelle from the medical center and informed him that the physician did not think it was necessary to perform a drug test because the plaintiff's behavior was explained by the amount of pain he was suffering. Trudelle told Congdon to instruct the plaintiff to call the center the next morning at nine o'clock to be told when to report for light duty.

"At some point after receiving the call from Congdon, Trudelle spoke to Sheahan. Trudelle told Sheahan that a drug test was not administered to the plaintiff. After consultation with Nick Reut, the district labor manager, Sheahan decided that the plaintiff's employment should be terminated for workplace violence. By the time the plaintiff arrived for light duty on December 3, Trudelle and Sheahan, with the assistance of [district risk manager Victor] Birch, had finalized a plan for terminating the plaintiff's employment.

"On December 3, the plaintiff arrived at the center at approximately 8:20 a.m. to speak with a union representative. He was able to speak briefly with a union representative, Michael Rabbit, until Trudelle told the plaintiff that the union representative had work to do, requested that the plaintiff leave the building and instructed him to call at nine o'clock. The plaintiff waited in his car until nine o'clock when he called Trudelle from the parking lot. Trudelle requested that the plaintiff return at about two o'clock that afternoon in casual clothes for temporary alternate work.

"When the plaintiff returned to the center that afternoon, he met in a conference room with Trudelle, Birch and a union representative, John Fitzgerald. The plaintiff was asked initially about November 30, the date of his injury. They then discussed the events of December 2. Trudelle and Birch left the room and determined that Trudelle would ask the plaintiff to submit to a fitness for duty test. When they returned to the room, Trudelle asked the plaintiff to submit to the test, and the plaintiff responded that he would submit to the test. Trudelle and Birch left the room again to confer, and when they returned Trudelle informed the plaintiff that he would not be sent for a fitness for duty test. Trudelle told the plaintiff that his employment was terminated for violating the defendant's policy against workplace violence, in light of the altercation the prior day." (Footnotes omitted.) Id., 594–600.

The subsequent pertinent procedural history of the case is as follows. "On September 29, 2006, the plaintiff filed a seven count complaint against [Trudelle and the defendant], alleging (1) negligent infliction of emotional distress against the defendants, (2) intentional infliction

of emotional distress against the defendants, and (3) violations of [General Statutes] § 31-51x against the defendants. Counts four and five alleged violations of 42 U.S.C. § 12112 (a) against the defendant. Counts six and seven alleged violations of § 46a-60 (a) (1) against the defendant. The defendants removed the case to federal District Court by notice of removal on October 20, 2006.

"On December 5, 2006, the plaintiff filed in the District Court an amended complaint that withdrew his claim in count three against Trudelle. On December 6, 2006, the defendants filed a motion to dismiss counts one, two, three and seven. The District Court granted the motion with respect to count seven and denied the motion with respect to counts one, two and three. On September 20, 2007, the defendants filed a motion for summary judgment on all remaining counts. The District Court granted the motion with respect to counts four and five, and remanded the remaining counts to the Superior Court.

"The defendants thereafter filed in the Superior Court a motion for summary judgment on February 23, 2009, on all remaining counts. The court granted the motion with respect to count two, but denied it as to the remaining counts.

"A jury trial commenced on June 29, 2010. After the plaintiff rested on July 6, 2010, the defendants moved for a directed verdict on counts one, three and six. The court heard argument on the matter and reserved a decision. On July 9, 2010, the jury returned a verdict in favor of the plaintiff, answering all twelve interrogatories in the affirmative. The jury awarded the plaintiff $250,000 for negligent infliction of emotional distress as to the defendant, $50,000 for negligent infliction of emotional distress as to Trudelle, $100,000 for a violation of § 31-51x and $100,000 for disability discrimination. Additionally, the jury awarded $500,000 in punitive damages.

"Several posttrial motions were filed. On July 19, 2010, the defendants timely moved to set aside the verdict. On the same day, the defendants also moved to set aside the award of punitive damages. . . .

"On October 28, 2010, the court, in a written decision, decided the remaining motions. The court denied the defendants' motions to set aside the verdict . . . and granted the defendant's motion to set aside the award of punitive damages." Id., 600–602. Both the defendant and the plaintiff appealed from the judgment of the court.

In *Tomick I*, the defendant argued that the trial court erred in denying its motion for a directed verdict as to count six because the plaintiff failed to establish a prima facie case of disability discrimination pursuant to § 46a-60, specifically as to the proof that the plaintiff was

qualified to perform the essential functions of his job. Id., 610. The defendant further argued that the court "did not apply precedent holding that the relevant date for determining whether a person is qualified is the date of the adverse employment action, and incorrectly determined that the relevant date was the same as that when the termination process occurred." Id. We agreed with the defendant's argument, but concluded that the record did not reflect which analytical framework the court applied in determining whether the plaintiff had met his prima facie case.[3] Id., 612. We further determined that the "finding made by the court that is before us is its conclusion that the plaintiff was a qualified individual on the operative date." Id. We thus assumed, "without deciding, that the court required the plaintiff to show that he was a qualified individual at the time of the adverse employment decision so as to make out a prima facie case." Id. We declined to address the merits of the claim, however, and remanded the matter to the trial court because "[a]bsent factual findings as to December 2, 2004, or December 3, 2004, the record is inadequate to ascertain whether the plaintiff would prevail under the correct legal standard." Id., 613. In doing so, we specifically instructed the court that it was "not precluded from reconsidering the issue of which analytical framework should be applied and what each framework requires the plaintiff to establish to make out a prima facie case."[4] Id., 613 n.17.

On remand, the trial court applied the pretext/ *McDonnell Douglas Corp.-Burdine* framework, finding it "the appropriate test because here the defendant has offered evidence that it terminated the plaintiff for violation of its workplace violence [policy], not as a defense, but rather as a response to the plaintiff's claim that the firing was pretextual."

As to the date of the adverse employment decision, the court determined that "the jury reasonably could have found that the adverse employment decision, i.e., the decision to terminate the plaintiff, occurred on December 1 [2004] and was communicated to [the] plaintiff by his supervisor in the parking lot on December 2, 2004. The meeting in the presence of the union representative on December 3, 2004, confirmed or ratified the earlier decision communicated to the plaintiff on December 2, 2004."

As to the plaintiff's qualification to perform the essential job functions, the court first held that the plaintiff was required to establish that he could perform the essential duties of his position on the date of the adverse employment decision under either analytical framework and then found that he "was qualified to perform the essential job functions [of a package car driver] on December 1 and December 2, 2004." The court further concluded, however, that "as of the late afternoon of December 2, 2004, the plaintiff was placed under medi-

cal restrictions and medications that would have prevented the plaintiff from performing the essential functions of the package car driver position." Having made the requisite findings, the court reaffirmed its denial of the defendant's motion for a directed verdict, stating that the plaintiff had established "his prima facie case for disability discrimination because the jury could have reasonably found that the plaintiff was qualified to work on December 2, 2004, when the defendant terminated the plaintiff based on his history of having a disability." These appeals followed. Additional facts and procedural history will be set forth as necessary.

I

DEFENDANT'S APPEAL

The defendant claims that the court abused its discretion in denying its motion for a directed verdict as to count six because the plaintiff failed to establish a prima facie case of disability discrimination pursuant to § 46a-60. Specifically, the defendant claims that the court erred in finding that (1) the adverse employment action occurred on December 2, 2004, and (2) that the plaintiff was qualified to perform the essential functions of his job on that date. We affirm the denial of the defendant's motion for a directed verdict because we conclude that, under the circumstances of this particular case, whether the plaintiff was qualified for his position on the date of the adverse employment decision is not relevant to the question of whether he was discriminated against by the defendant on the basis of his preexisting disability.

We begin by setting forth the appropriate legal framework. The "standards of review for the denial of a motion for a directed verdict and denial of a motion to set aside a verdict are the same. . . . Ordinarily, [t]he proper appellate standard of review when considering the action of a trial court granting or denying a motion to set aside a verdict . . . [is] the abuse of discretion standard. . . . [O]ur review of a trial court's refusal to direct a verdict . . . takes place within carefully defined parameters. We must consider the evidence, including reasonable inferences which may be drawn therefrom, in the light most favorable to the parties who were successful at trial . . . giving particular weight to the concurrence of the judgments of the judge and the jury, who saw the witnesses and heard the testimony . . . ." (Citations omitted; internal quotation marks omitted.) *Tomick I*, supra, 135 Conn. App. 603. "Directed verdicts are not favored. . . . As a general rule, the decision to set aside a verdict entails the exercise of a broad legal discretion . . . that, in the absence of clear abuse, we shall not disturb." (Citations omitted; internal quotation marks omitted.) *Rawls* v. *Progressive Northern Ins. Co.*, 310 Conn. 768, 775–76, 83 A.3d 576 (2014). We note further that, to the extent that the claims raise questions of law, our review is plenary.

See *Bridgeport Harbour Place I, LLC* v. *Ganim*, 131 Conn. App. 99, 153, 30 A.3d 703 (applying plenary review where questions of law were raised by defendant, claiming that court improperly denied motion for directed verdict and to set aside verdict), cert. granted on other grounds, 303 Conn. 904, 905, 31 A.3d 1179, 1180 (2011) (appeals withdrawn January 26 and 27, 2012).

## A

### Applicable Analytical Framework

"The legal standards governing discrimination claims involving adverse employment actions are well established. The framework this court employs in assessing disparate treatment discrimination claims under Connecticut law was adapted from the United States Supreme Court's decision in *McDonnell Douglas Corp.* v. *Green*, 411 U.S. 792, 802, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), and its progeny."[5] (Internal quotation marks omitted.) *Feliciano* v. *Autozone, Inc.*, 316 Conn. 65, 73, A.3d (2015); *Vollemans* v. *Wallingford*, 103 Conn. App. 188, 928 A.2d 586 (2007) (where employee claims disparate treatment under facially neutral employment policy, courts employ *McDonnell Douglas Corp.-Burdine* framework), aff'd, 289 Conn. 57, 956 A.2d 579 (2008). Furthermore, it is well settled that "[w]e look to federal law for guidance on interpreting state employment discrimination law, and the analysis is the same under both."[6] *Feliciano* v. *Autozone, Inc.*, supra, 73; *Curry* v. *Allan S. Goodman, Inc.*, 286 Conn. 390, 415, 944 A.2d 925 (2008); *Craine* v. *Trinity College*, 259 Conn. 625, 637 n.6, 791 A.2d 518 (2002); *Levy* v. *Commission on Human Rights & Opportunities*, 236 Conn. 96, 103, 671 A.2d 349 (1996); *Walker* v. *Dept. of Children & Families*, 146 Conn. App. 863, 875 n.8, 80 A.3d 94 (2013), cert. denied, 311 Conn. 917, 85 A.3d 653 (2014).

In general, to "establish a prima facie case of discrimination [under the *McDonnell Douglas Corp.-Burdine* framework], the complainant must demonstrate that (1) he is in the protected class; (2) he was qualified for the position; (3) he suffered an adverse employment action; and (4) that the adverse action occurred under circumstances giving rise to an inference of discrimination. . . . The level of proof required to establish a prima facie case is minimal and need not reach the level required to support a jury verdict in the plaintiff's favor." (Citation omitted; internal quotation marks omitted.) *Vollemans* v. *Wallingford*, supra, 103 Conn. App. 220. "Under the *McDonnell Douglas-Burdine* [framework], the burden of persuasion remains with the plaintiff. . . . Once the plaintiff establishes a prima facie case, however, the burden of production shifts to the defendant to rebut the presumption of discrimination by articulating (not proving) some legitimate, nondiscriminatory reason for the plaintiff's rejection. . . . Because the plaintiff's initial prima facie case does not

require proof of discriminatory intent, the *McDonnell Douglas-Burdine* [framework] does not shift the burden of persuasion to the defendant. Therefore, [t]he defendant need not persuade the court that it was actually motivated by the proffered reasons. . . . It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff. . . . Once the defendant offers a legitimate, nondiscriminatory reason, the plaintiff then has an opportunity to prove by a preponderance of the evidence that the proffered reason is pretextual." (Citations omitted; internal quotation marks omitted.) *Levy* v. *Commission on Human Rights & Opportunities*, supra, 236 Conn. 107–109.

B

Prima Facie Case of Discrimination

In its brief, the defendant argues that "[i]t is fundamental, under both state and federal law, that a plaintiff bringing a claim of disability [discrimination] must be capable of performing his/her essential job functions as of the date of the adverse employment action being challenged . . . ." We disagree.

It is beyond dispute that the prima facie case requirements under *McDonnell Douglas Corp.-Burdine* are meant to be flexible. Even in *McDonnell Douglas Corp.* v. *Green*, supra, 411 U.S. 792—the case that first outlined the model— the United States Supreme Court explicitly stated that the "facts necessarily will vary in Title VII cases, and the specification above of the prima facie proof required from respondent is not necessarily applicable in every respect to differing factual situations." Id., 802 n.13. Later, the Supreme Court further clarified the adaptability of the test, stating that the *McDonnell Douglas Corp.* decision "did not purport to create an inflexible formulation" of a prima facie showing and that the "importance of *McDonnell Douglas* lies, not in its specification of the discrete elements of proof there required, but in its recognition of the general principle that any Title VII plaintiff must carry the initial burden of offering evidence adequate to create an inference that an employment decision was based on a discriminatory criterion . . . ." *International Brotherhood of Teamsters* v. *United States*, 431 U.S. 324, 358, 97 S. Ct. 1843, 52 L. Ed. 2d 396 (1977); see also *Texas Dept. of Community Affairs* v. *Burdine*, 450 U.S. 248, 253 n.6, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981) ("[*McDonnell Douglas Corp.*] standard is not inflexible"). Furthermore, in *United States Postal Service Board of Governors* v. *Aikens*, 460 U.S. 711, 715, 103 S. Ct. 1478, 75 L. Ed. 2d 403 (1983), the Supreme Court plainly stated that the "factual inquiry in a Title VII case is [whether] the defendant intentionally discriminated against the plaintiff. . . . In other words, is the employer . . . treating some people less favorably than others because of their race, color, religion,

sex, or national origin. . . . The *prima facie* case method established in *McDonnell Douglas* was never intended to be rigid, mechanized, or ritualistic. Rather, it is merely a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination." (Citations omitted; emphasis added; internal quotation marks omitted.) This principle has since been adopted and affirmed by our Supreme Court. See *Levy* v. *Commission on Human Rights & Opportunities*, supra, 236 Conn. 108 n.20 (*McDonnell Douglas Corp.* "standard is not rigid; the prima facie elements should be modified appropriately depending on the respective factual scenario"); see also *Miko* v. *Commission on Human Rights & Opportunities*, 220 Conn. 192, 204, 596 A.2d 396 (1991) ("the requirements of proof [under *McDonnell Douglas Corp.-Burdine*] must be tailored to the particular facts of each case"); *Chestnut Realty, Inc.* v. *Commission on Human Rights & Opportunities*, 201 Conn. 350, 361, 514 A.2d 749 (1986) (same).

Nevertheless, to support its narrow interpretation of the *McDonnell Douglas Corp.-Burdine* model, the defendant cites to both federal and Connecticut cases in which courts have required a showing of qualification as part of the prima facie case. Close examination of these cases, however, reveals that the courts required a showing of qualification precisely because it was germane to the issues involved. For example, in *Curry* v. *Allan S. Goodman, Inc.*, supra, 286 Conn. 398–99, one of the cases cited by the defendant, our Supreme Court required the plaintiff to show that he was qualified to perform the essential duties of the job because the employer's stated reason for termination was its inability to continue employing the plaintiff with or without a reasonable accommodation. Simply stated, the employer's position was that the plaintiff could not do his job or any other job and, therefore, the employer was not required to continue employing the plaintiff. Thus, the plaintiff's qualifications were essential in determining whether the employer could in fact employ the plaintiff with or without a reasonable accommodation.

Similarly, in *McBride* v. *BIC Consumer Products Mfg. Co.*, 583 F.3d 92, 96–97 (2d Cir. 2009), another accommodation case cited by the defendant, the plaintiff was required to make a sufficient showing that she was capable of performing the essential functions of either her predisability position or some other position to which she could have been reassigned because the employer's stated reason for the termination of her employment was that she had refused to accept the proposed accommodation of her disability and failed to propose any alternative accommodation that would allow her to return to work in her previous position. Once again, the plaintiff's qualifications were germane to the determination of whether it was possible for

the employer to accommodate and thus continue to employ her.[7]

If, however, the question of qualification is not relevant to the main question of whether there was discrimination, our Supreme Court holds that no such showing is necessary on the part of the plaintiff. See *Perez-Dixon* v. *Bridgeport*, 304 Conn. 483, 43 A.3d 69 (2012). In *Perez-Dixon*, the plaintiff, an African-American school principal, was accused of sexually abusing a student— an allegation that was later determined to be unsubstantiated. Pending the investigation, the district superintendent placed the plaintiff on administrative leave. Thereafter, the plaintiff brought an action, claiming that other employees were treated more favorably than the plaintiff under similar circumstances. On review, our Supreme Court concluded that the plaintiff's claim was subject to the *McDonnell Douglas Corp.-Burdine* framework analysis. The court explicitly stated, however, that even though in "some employment contexts, such as claims involving hiring, promoting or granting tenure, the plaintiff must show that she was qualified to hold her employment position," because, in this particular case, "the question of whether the plaintiff was qualified for her position is not relevant to the question of whether she was subjected to harsher discipline than other employees on the basis of her race, we conclude that it is not an element of her prima facie case." Id., 514 n.34.

Having reviewed the history and the purpose behind the *McDonnell Douglas Corp.-Burdine* framework, as well as the evolution of the case law interpreting and applying it, we conclude that the defendant's view of the law governing employment discrimination is contrary to that expressed in *McDonnell Douglas Corp.-Burdine* and its progeny. The *McDonnell Douglas Corp.-Burdine* framework does not create, as the defendant contends, a "*fundamental*" requirement that a plaintiff bringing a claim of disability discrimination "must be capable of performing his/her essential job functions as of the date of the adverse employment action being challenged . . . ." (Emphasis added.) On the contrary, the *McDonnell Douglas Corp.-Burdine* framework mandates a flexible approach tailored to the specific factual circumstances of each case.

With these principles in mind, we now turn to the present dispute. Our examination of the factual circumstances of this particular case convinces us that the question of whether the plaintiff was qualified to perform the essential duties of his position at the time of the termination is not relevant for two reasons.

First, unlike in the cases relied on by the defendant in its brief, in this case the plaintiff was already an employee of the defendant, and his qualifications for the position held at the time were not being challenged; i.e., the defendant was not asserting that it could no

longer continue to employ the plaintiff, with or without reasonable accommodations, on the basis of his unsatisfactory performance or lack of qualifications as a result of his disability. On the contrary, the defendant steadfastly maintained throughout this litigation that it "has never asserted that it discharged [the plaintiff] because of his alleged disability." Instead, the defendant always maintained that it terminated the plaintiff's employment for a violation of its workplace violence policy.

Second, it is axiomatic that requiring a plaintiff to establish his or her job qualification serves the purpose of eliminating one of the most common "legitimate *reasons* on which an employer might rely to reject a job applicant: an absolute or relative lack of qualifications . . . ." (Emphasis added.) *International Brotherhood of Teamsters* v. *United States*, supra, 431 U.S. 358 n.44; see also *Texas Dept. of Community Affairs* v. *Burdine*, supra, 450 U.S. 253–54 ("[t]he prima facie case serves an important function in the litigation: it eliminates the most common nondiscriminatory reasons for the plaintiff's rejection"). In this case, however, the defendant could not have relied on the plaintiff's alleged lack of qualifications because, at the time of the termination, the defendant did not know whether the injury the plaintiff sustained on November 30, 2004, had rendered the plaintiff unqualified, and it is settled, of course, that after-acquired "evidence may not be used to prove an employer's *motivation* with respect to a prospective or current employee because the employer did not have those facts before it at the time that it made the contested decision." (Emphasis in original.) *Curry* v. *Allan S. Goodman, Inc.*, supra, 286 Conn. 422 n.19.

Consequently, because the question of whether the plaintiff was qualified for his position is not relevant to the question of whether he was discriminated against by the defendant, we conclude that it is not an element of his prima facie case.[8] To establish his prima facie case of discrimination in this case, the plaintiff had to present evidence that: (1) he belonged to a protected class; (2) he was subject to an adverse employment action; and (3) the adverse action took place under circumstances permitting an inference of discrimination. The review of the record confirms that he presented evidence to prove each remaining element, and, thus, established his prima facie case of discrimination. Therefore, we conclude that the trial court did not abuse its discretion in denying the defendant's motion for a directed verdict.

## II

### PLAINTIFF'S CROSS APPEAL

The plaintiff claims on cross appeal that the court erred in concluding that § 46a-104 does not authorize an award of punitive damages.[9] Specifically, the plaintiff argues that by "using the phrase, 'including, but not

limited to,' to modify the phrase 'legal and equitable relief,' the legislature undoubtedly intended to authorize all forms of appropriate legal and equitable relief, including punitive damages," which, he claims, "are undeniably a form of legal relief . . . ." We are not persuaded.

The following facts, as found by the court, and procedural history are relevant to our discussion. "On July 9, 2010, the jury determined that the plaintiff's physical disability was a motivating factor in [the defendant's] decision to terminate his employment. It further responded affirmatively to jury interrogatory [no.] 12, which asked, 'Do you believe that [the defendant] willfully violated the plaintiff's rights such that he should be entitled to an award of punitive damages?' Thereafter, in an appropriate blank on the verdict form, the jury awarded the plaintiff $500,000 in punitive damages."

On July 16, 2010, the defendant filed a motion to set aside the award, and the plaintiff filed a memorandum of law in opposition to the motion on August 9, 2010. On October 28, 2010, the court issued a comprehensive written memorandum of decision granting, inter alia, the defendant's motion to set aside the award of punitive damages.

In its memorandum of decision, the court, having reviewed the legislative history, the policy that the statute was designed to address, and the language of § 46a-104 as compared with other statutory provisions, concluded that "punitive damages are not authorized in this case to be imposed by either the jury or the court."[10] Id.

We first note that the question of whether § 46a-104 authorizes an award of punitive damages previously has not been addressed directly by either this court or our Supreme Court.[11] We further note that there is a split of authority within our Superior Courts on the issue. See *Jill Tracy* v. *Smith Ins., Inc.*, Superior Court, judicial district of New London, Docket No. CV-14-6020529-S (November 4, 2014) (finding that § 46a-104 allows awarding punitive damages and listing Superior Court decisions in support and opposition).

We begin by setting forth the applicable standard of review. "The trial court possesses inherent power to set aside a jury verdict which, in the court's opinion, is against the law or the evidence. . . . Ultimately, [t]he decision to set aside a verdict entails the exercise of a broad legal discretion . . . that, in the absence of clear abuse, we shall not disturb." (Citation omitted; internal quotation marks omitted.) *Perez* v. *D & L Tractor Trailer School*, 117 Conn. App. 680, 709, 981 A.2d 497 (2009), cert. denied, 294 Conn. 923, 985 A.2d 1062 (2010). However, we employ a plenary standard of review in deciding the question of statutory interpretation. See *Miller* v. *Egan*, 265 Conn. 301, 327, 828 A.2d 549 (2003).

"When construing a statute, [o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case . . . . In seeking to determine that meaning, General Statutes § 1-2z directs us first to consider the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered. . . . When a statute is not plain and unambiguous, we also look for interpretive guidance to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter . . . ." (Footnote omitted; internal quotation marks omitted.) *Vincent* v. *New Haven*, 285 Conn. 778, 784–85, 941 A.2d 932 (2008). "An axiomatic rule of statutory construction is that statutes should be construed so that no part of a legislative enactment is to be treated as insignificant and unnecessary, and there is a presumption of purpose behind every sentence, clause or phrase in a legislative enactment." (Internal quotation marks omitted.) *Fishbein* v. *Kozlowski*, 252 Conn. 38, 61, 743 A.2d 1110 (1999).

Section 46a-104 provides: "The court may grant a complainant in an action brought in accordance with section 46a-100 such legal and equitable relief which it deems appropriate including, but not limited to, temporary or permanent injunctive relief, attorney's fees and court costs. The amount of attorney's fees allowed shall not be contingent upon the amount of damages requested by or awarded to the complainant." On its face, the language of the statute does not expressly provide for punitive damages; however, it does provide for an award of attorney's fees and court costs.

In *Ames* v. *Commissioner of Motor Vehicles*, 267 Conn. 524, 839 A.2d 1250 (2004), our Supreme Court considered whether explicit statutory language is required for an award of multiple damages, which are a form of punitive damages. See *Harty* v. *Cantor Fitzgerald & Co.*, 275 Conn. 72, 92 n.10, 881 A.2d 139 (2005) ("this court has, on occasion, referred to a statutory multiple damage provision as providing punitive damages even in the absence of such express designation by the legislature"). In *Ames*, the court was asked to determine whether General Statutes § 14-52 authorized an award of punitive damages.[12] The plaintiff in the case brought an action against the defendant, a used automobile dealer, for the unlawful repossession of the plaintiff's automobile. The plaintiff sought to recover statutory, actual, punitive and treble damages pursuant

to General Statutes § 52-564 as well as attorney's fees under the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq.[13] The defendant was defaulted for failure to appear, and the court awarded the plaintiff damages that included treble damages and attorney's fees. The defendant failed to satisfy the judgment and went out of business. Consequently, after the Commissioner of Motor Vehicles invoked the surety bond posted by the defendant pursuant to § 14-52, the plaintiff argued that the surety bond should have been used to satisfy the judgment, including the punitive damages and attorney's fees.

On appeal, the court rejected the plaintiff's claim, stating that an "award of multiple damages . . . is an extraordinary remedy that is available only when the legislature expressly provides for such damages by statute. . . . Accordingly, as with attorney's fees, we require explicit statutory language to support an award of punitive damages. Put simply, just as the legislature knows how to authorize an award of attorney's fees when it wishes to do so . . . it also knows how to authorize an award of punitive damages. E.g., General Statutes § 4d-39 (c) (in action by attorney general to prosecute violation under General Statutes §§ 4d-36, 4d-37 or 4d-38, court may 'award [inter alia] punitive damages'); General Statutes § 16-8d (b) (in action by employee alleging retaliation for disclosure of substantial misfeasance, malfeasance or nonfeasance in management of, inter alia, public service company, court 'may award punitive damages'); General Statutes § 19a-550 (e) ('punitive damages may be assessed in civil action in which there is finding of wilful or reckless deprivation of rights under patients' bill of rights implemented in accordance with § 19a-550'); General Statutes § 31-290a (b) (in action alleging retaliation against employee for filing workers' compensation claim, 'court may . . . award punitive damages')." (Citations omitted.) *Ames* v. *Commissioner of Motor Vehicles*, supra, 267 Conn. 536. Thus, the court concluded that, because "§ 14-52 makes no mention of punitive damages, the plaintiff cannot prevail on her claim that she may recover such damages under [the statute]." Id.

In his brief, the plaintiff argues that *Ames* is inapposite because the "any loss" language under scrutiny in *Ames* is dramatically different from the language in § 46a-104, which provides for "all forms of legal and equitable relief," including punitive damages. In addition, the plaintiff argues that the holding of the case is limited to the language of § 14-52 and, thus, the court's statements regarding punitive damages are dicta and not binding on this court. We are not persuaded by the plaintiff's arguments.

Even if we agreed, arguendo, with the plaintiff that language of § 46a-104 is sufficiently broad to provide for punitive damages, we nevertheless conclude that

such a reading of the statute would be contrary to our established law. In Connecticut, common-law punitive damages, if awarded, "are restricted to cost of litigation less taxable costs of the action being tried . . . ." (Internal quotation marks omitted.) *Harty* v. *Cantor Fitzgerald & Co.*, supra, 275 Conn. 93; *Larsen Chelsey Realty Co.* v. *Larsen*, 232 Conn. 480, 517 n.38, 656 A.2d 1009 (1995) ("[u]nder Connecticut common law, the term 'punitive damages' refers to the expenses of bringing the legal action, including attorney's fees, less taxable costs"). Thus, if the plaintiff's interpretation of the statute were to prevail, he would effectively be allowed to double his recovery of litigation costs because, of course, § 46a-104 already explicitly authorizes an award of attorney's fees and costs. Such a result would alter our settled common-law rule limiting punitive damages to a single recovery of litigation expenses because their purpose is to make a victim whole while avoiding the potential injustice resulting from unfettered exercise of discretion by a jury.[14] See *Label Systems Corp.* v. *Aghamohammadi*, 270 Conn. 291, 335, 852 A.2d 703 (2004) ("[l]imiting punitive damages to litigation expenses, including attorney's fees, fulfills the salutary purpose of fully compensating a victim for the harm inflicted" [internal quotation marks omitted]). Our law is clear, however; a court "will not interpret a statute to have the effect of altering prior statutory or common law unless the language of the statute clearly expresses an intent to have such an effect." *Elliot* v. *Sears, Roebuck & Co.*, 229 Conn. 500, 515, 642 A.2d 709 (1994); see also *Ulbrich* v. *Groth*, 310 Conn. 375, 448, 78 A.3d 76 (2013) (same). Our review of the language in § 46a-104 does not reveal a clear intent to provide multiple recovery of attorney's fees and litigation costs, and we will not infer one.

We also disagree with the plaintiff that the court's rationale concerning punitive damages in *Ames* is mere dictum. "Dictum includes those discussions that are merely passing commentary . . . those that go beyond the facts at issue . . . and those that are unnecessary to the holding in the case." (Internal quotation marks omitted.) *Cruz* v. *Montanez*, 294 Conn. 357, 376–77, 984 A.2d 705 (2009). In *Ames*, the court discussed and decided the issue of whether the plaintiff was "entitled to recover punitive damages against a surety bond furnished in accordance with § 14-52." *Ames* v. *Commissioner of Motor Vehicles*, supra, 267 Conn. 536. Thus, the court's analysis of the issue was not only germane, but it was essential to the resolution of the question of whether the language of the statute authorized an award of punitive damages.[15] Therefore, we are not persuaded by the plaintiff's argument that we should disregard the court's analysis in *Ames* as dictum. To the contrary, we conclude that it is binding on this court.

Additionally, our review of title 46a of our General Statutes reveals that our legislature explicitly has pro-

vided for punitive damages in at least three separate instances therein. See General Statutes § 46a-98 (c) and (d) (explicitly providing punitive damages in cases of discriminatory credit practices with a specified maximum cap); General Statutes § 46a-98a (authorizing punitive damages in cases of housing discrimination pursuant to General Statutes § 46a-89 [b] limited to $50,000); General Statutes § 46a-89 (b) (allowing punitive damages in cases of discriminatory public accommodations and housing practices pursuant to General Statutes §§ 46a-64, 46a-64 [c], and General Statutes §§ 46a-81d and 46a-81e, which prohibit public accommodations and housing discrimination based on sexual orientation). These explicit provisions further persuade us that the legislature knows how to provide for punitive damages when it deems it appropriate. *Ames* v. *Commissioner of Motor Vehicles*, supra, 267 Conn. 536.

Because the language of § 46a-104 does not explicitly provide for punitive damages, the plaintiff is not entitled to such relief under the statute. We thus conclude that the court did not abuse its discretion in setting aside the award of punitive damages.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] At all relevant times, Kevin Trudelle was the business manager of the Norwich/Niantic center of United Parcel Service, Inc. We refer to United Parcel Service, Inc., individually, as the defendant, to Trudelle by name and to both parties collectively as the defendants.

[2] General Statutes § 46a-60 (a) provides in relevant part: "It shall be a discriminatory practice in violation of this section: (1) For an employer, by the employer or the employer's agent, except in the case of a bona fide occupational qualification or need, to refuse to hire or employ or to bar or to discharge from employment any individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment because of the individual's . . . physical disability . . . ."

[3] During the trial, the plaintiff maintained that his claim should have been analyzed under the mixed motive framework articulated by the United States Supreme Court in *Price Waterhouse* v. *Hopkins*, 490 U.S. 228, 246, 109 S. Ct. 1775, 104 L. Ed. 2d 268 (1989). The defendant, on the other hand, argued that the claim was subject to the pretext framework analysis established by the United States Supreme Court in *McDonnell Douglas Corp.* v. *Green*, 411 U.S. 792, 802, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), and *Texas Dept. of Community Affairs* v. *Burdine*, 450 U.S. 248, 252–56, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981). See *Tomick I*, supra, 135 Conn. App. 610–11.

[4] Because we remanded the claim brought pursuant to § 46a-60, we did not review the plaintiff's challenge to the court's setting aside the award of punitive damages. *Tomick I*, supra, 135 Conn. App. 594 n.4.

[5] We further note that the pretext/*McDonnell Douglas Corp.-Burdine* framework is not an exclusive means of proving employment discrimination in Connecticut. Depending on the circumstances of the case, a plaintiff may be able to prove his claim under a different framework. "A mixed-motive case exists when an employment decision is motivated by both legitimate and illegitimate reasons. . . . In such instances, a plaintiff must demonstrate that the employer's decision was motivated by one or more prohibited statutory factors. Whether through direct evidence or circumstantial evidence, a plaintiff must submit enough evidence that, if believed, could reasonably allow a [fact finder] to conclude that the adverse employment consequences resulted because of an impermissible factor. . . . The critical inquiry [in a mixed-motive case] is whether [a] discriminatory motive was a factor in the [employment] decision at the moment it was made. . . . Under this model, the plaintiff's prima facie case requires that the plaintiff prove by a preponderance of the evidence that he or she is within a protected class and that an impermissible factor played a motivating or substantial

role in the employment decision. . . .

"Once the plaintiff has established his prima facie case, the burden of production and persuasion shifts to the defendant. [T]he defendant may avoid a finding of liability only by proving by a preponderance of the evidence that it would have made the same decision even if it had not taken [the impermissible factor] into account." (Citations omitted; footnotes omitted; internal quotation marks omitted.) *Levy* v. *Commission on Human Rights & Opportunities*, 236 Conn. 96, 105–106, 671 A.2d 349 (1996).

Having reviewed the record before us, we conclude that, in this case, the court properly applied the pretext/*McDonnell Douglas Corp.-Burdine* framework. The plaintiff argued at trial that the defendant's stated reason for the termination of his employment—workplace violence—was "not believable," that the defendant was looking for a "gotcha" moment, "a reason," and "every possible excuse in the book" to terminate his employment.

[6] We note, however, that "while often a source of great assistance and persuasive force . . . it is axiomatic that decisions of the United States Supreme Court [or lower federal courts] are not binding on Connecticut courts tasked with interpreting our General Statutes. Rather, Connecticut is the final arbiter of its own laws." (Citation omitted; internal quotation marks omitted.) *Vollemans* v. *Wallingford*, supra, 103 Conn. App. 199–200.

[7] Having reviewed the remainder of the cases relied on by the defendant, we conclude that they offer no support for the defendant's position because the issue of qualification was relevant to the resolution of these cases. See *Timmons* v. *General Motors Corp.*, 469 F.3d 1122 (7th Cir. 2006); *Chasse* v. *Computer Sciences Corp.*, 453 F. Supp. 2d 503 (D. Conn. 2006); *Henderson* v. *United Parcel Service*, United States District Court, Docket No. 3:03CV2135 (CFD) (D. Conn. March 23, 2007); *Erisoty* v. *Merrow Machine Co.*, 34 Conn. App. 708, 643 A.2d 898, cert. denied, 231 Conn. 908, 648 A.2d 151 (1994); *Morris* v. *Tri-Town Teachers Federal Credit Union*, Superior Court, judicial district of Fairfield, Docket No. CV-98-0354839-S (July 13, 2000).

[8] Accordingly, we need not address whether the trial court correctly determined the date of the adverse employment decision and that the plaintiff was qualified to perform the essential functions of his job on that date.

[9] General Statutes § 46a-104 provides: "The court may grant a complainant in an action brought in accordance with section 46a-100 such legal and equitable relief which it deems appropriate including, but not limited to, temporary or permanent injunctive relief, attorney's fees and court costs. The amount of attorney's fees allowed shall not be contingent upon the amount of damages requested by or awarded to the complainant."

[10] The plaintiff also argues that punitive damages under § 46a-104 must be awarded by the jury and not the court. Because we conclude that § 46a-104 does not authorize an award of punitive damages, we need not address the plaintiff's argument. But see *Jackson* v. *Water Pollution Control Authority*, 278 Conn. 692, 710 n.16, 900 A.2d 498 (2006) ("§ 46a-104 appears to leave the issue of remedy to the trial court's sound discretion").

[11] See *Perez* v. *D & L Tractor Trailer School*, 117 Conn. App. 680, 709–10, 981 A.2d 497 (2009) (affirming trial court's award of attorney's fees as form of punitive damages because § 46a-104 explicitly authorizes award of attorney's fees), cert. denied, 294 Conn. 923, 985 A.2d 1062 (2010); see also *Ware* v. *State*, 118 Conn. App. 65, 87 n.14, 983 A.2d 853 (2009) (declining to address whether § 46a-104 authorizes punitive damages against private party).

[12] General Statutes § 14-52 (b) (4) requires, inter alia, licensed automobile dealers and repairers to post a surety bond that could be used "as indemnity for *any loss* sustained by any customer by reason of any acts of the licensee constituting grounds for suspension or revocation of the license or such licensee going out of business. . . ." (Emphasis added.)

[13] General Statutes § 52-564 provides, inter alia, that "[a]ny person who steals any property of another, or knowingly receives and conceals stolen property, shall pay the owner treble his damages."

General Statutes § 42-110g (d) provides, inter alia, that a party prevailing under a CUTPA claim may be awarded "costs and reasonable attorneys' fees . . . ."

[14] The plaintiff further argues that, because punitive damages in this case are authorized by the statute, they are not subject to the common-law limitations. To support this proposition, the plaintiff relies on our Supreme Court holdings in *Ulbrich* v. *Groth*, 310 Conn. 375, 78 A.3d 76 (2013); *MedValUSA Health Programs, Inc.* v. *MemberWorks, Inc.*, 273 Conn. 634, 872

A.2d 423, cert. denied sub nom. *Vertrue, Inc.* v. *MedValUSA Health Programs, Inc.*, 546 U.S. 960, 126 S. Ct. 479, 163 L. Ed. 2d 363 (2005); and *Freeman* v. *Alamo Management Co.*, 221 Conn. 674, 607 A.2d 370 (1992). Having reviewed these decisions, we conclude that they are inapposite to this case. The statutes at issue in *Ulbrich*, *MedValUSA Health Programs, Inc.*, and *Freeman* explicitly allow an award of punitive damages. As such, the holdings in these cases squarely adhered to our long-standing principle that we "recognize only those alterations of the common law that are clearly expressed in the language of the statute . . . ." *Lynn* v. *Haybuster Mfg., Inc.*, 226 Conn. 282, 290, 627 A.2d 1288 (1993); see also *Hylton* v. *Gunter*, 313 Conn. 472, 486 n.14, 97 A.3d 970 (2014) ("[p]unitive damages under these statutes, particularly under statutes that provide for awards of fees and costs in addition to punitive damages like CUTPA . . . are distinct from common-law punitive damages because they are not intended merely to compensate the plaintiff for the harm caused by the defendant but, rather, serve a broader . . . purpose" [citation omitted; internal quotation marks omitted]). Section 46a-104 does not contain such clear expression and, therefore, we are not persuaded by the plaintiff's argument.

[15] In his brief, the plaintiff further argues that the holding in *Ames* is inapposite because "the objectives of § 14-52 and [the Connecticut Fair Employment Practices Act, General Statutes § 46a-51 et seq., of which § 46a-104 is a part] could not be more different. While § 14-52 was enacted to allow consumers to obtain reimbursement for *some* of the money owed to them by automobile dealers who have gone out of business, [the fair employment practices act] was enacted to eradicate workplace discrimination" and, thus, it "must be interpreted with that remedial purpose in mind." (Emphasis in original.) We conclude, however, that our interpretation of § 46a-104 as not allowing for punitive damages does not thwart the remedial purpose of the fair employment practices act because the statute already provides for attorney's fees and costs that, "when viewed in the light of the increasing costs of litigation, also [serve] to punish and deter wrongful conduct." *Berry* v. *Loiseau*, 223 Conn. 786, 827, 614 A.2d 414 (1992).